**Filed
06-9000/9001
05/06/08
Marcia M. Waldron,
Clerk**

NOS. 06-9000 & 06-9001

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

UNITED STATES OF AMERICA,

Appellee/Cross-Appellant

v.

DAVID PAUL HAMMER,

Appellant/Cross-Appellee

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

BRIEF FOR THE UNITED STATES

_____

MARTIN C. CARLSON
United States Attorney
Middle District of Pennsylvania

FREDERICK E. MARTIN
Assistant U.S. Attorney
Middle District of Pennsylvania

GWYNN X KINSEY, JR.
Attorney
U.S. Department of Justice
Room 336
1331 F Street, N.W.
Washington, D.C. 20530
Telephone: (202) 353-9721

TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Issues Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Standards of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

I. & II.     Trial counsel properly elected not to present an "accident" theory or
             Hammer's long history of false confessions, both of which risked
             serious harm to Hammer's defense . . . . . . . . . . . . . . . . . . . . . . . . . . 42

III.         Section 2255's limitations period barred Hammer's claim that counsel
             were ineffective for failing to challenge the court-ordered, in-patient
             competency evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

IV.          The district court erred in finding a violation of Brady and setting
             aside Hammer's death sentence, where Hammer and counsel were
             aware of his allegedly-suppressed history of sexual bondage. . . . . 57

V.           Hammer's claim that the jury erroneously failed to find "undisputed"
             mitigating factors was barred by the procedural default and non-
             retroactivity doctrines, and lacked merit . . . . . . . . . . . . . . . . . . . . . 66

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Certificate of Bar Membership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Certificate of Word Count, Identical Compliance, and Virus Check . . . . . . . . . . 77

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Ake v. Oklahoma*, 470 U.S. 68 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Beard v. Banks*, 542 U.S. 406 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Bousley v. United States*, 523 U.S. 614 (1998) . . . . . . . . . . . . . . . . . . . . . . . 68, 69

*Boyde v. California*, 494 U.S. 370 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 71

*Brady v. Maryland*, 373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 37

*Buchanan v. Angelone*, 522 U.S. 269 (1998) . . . . . . . . . . . . . . . . . . . . . . . . 70

*Caspari v. Bohlen*, 510 U.S. 383 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Fahy v. Horn*, 240 F.3d 239 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Fullwood v. Lee*, 290 F.3d 663 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . 59

*Gregg v. Georgia*, 428 U.S. 153 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Hammer v. United States*, 128 S. Ct. 43 (2007) . . . . . . . . . . . . . . . . . . . . . . . 5

*Hill v. Lockhart*, 474 U.S. 52 (1985) . . . . . . . . . . . . . . . . . . . . . . . . 45, 46, 48, 49

*Johnson v. Hendricks*, 314 F.3d 159 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . 56

*Kimmelman v. Morrison*, 477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Kyles v. Whitley*, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Lockett v. Ohio*, 433 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Mayle v. Felix*, 545 U.S. 644 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 55

*McCoy v. North Carolina*, 494 U.S. 433 (1990) . . . . . . . . . . . . . . . . . . . . . . . . 70

*Mills v. Maryland*, 486 U.S. 367 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Murray v. Carrier*, 477 U.S. 478 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Oregon v. Guzek*, 546 U.S. 517 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Penry v. Lynaugh*, 492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Rompilla v. Beard*, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669 (2006) . . . . . . . . . . . . . . . . . . . . . . 67

*Sawyer v. Whitley*, 505 U.S. 333 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Schlup v. Delo*, 513 U.S. 298 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Schriro v. Summerlin*, 542 U.S. 348 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Zant v. Stephens*, 462 U.S. 862 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . passim

*Strickler v. Greene*, 527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 65

*Teague v. Lane*, 489 U.S. 288 (1989) . . . . . . . . . . . . . . . . . . . . . . 42, 57, 69, 75

*Tuilaepa v. California*, 512 U.S. 967 (1994) . . . . . . . . . . . . . . . . . . . . . . 69, 71, 74

*United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002) . . . . . . . . . . . . . . . . 72, 74

*United States v. Chandler*, 218 F.3d 1305 (11th Cir. 2000) . . . . . . . . . . . . . . . 74

*United States v. Cross*, 308 F.3d 308 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . 37

*United States v. Davenport*, 217 F.3d 1341 (11th Cir. 2000) . . . . . . . . . . . . . . 55

*United States v. Diaz*, 922 F.2d 998 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . 59

*United States v. Duffus*, 174 F.3d 333 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . 53, 54

*United States v. Frady*, 456 U.S. 152 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*United States v. Hall*, 152 F.3d 381 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . 73, 74

*United States v. Hammer*, 25 F. Supp. 2d 518 (M.D. Pa. 1998) . . . . . . . . . . passim

*United States v. Hammer*, 226 F.3d 229 (3rd Cir. 2000), *cert. denied*, 532 U.S. 959 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 67

*United States v. Hammer*, 239 F.3d 302 (3rd Cir.), *cert. denied*, 534 U.S. 831 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Hammer*, 404 F. Supp. 2d 676 (M.D. Pa. 2005) . . . . . . . . . . . 1, 4

*United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996) . . . . . . . . . . . . . . . . 73

*United States v. Parker*, 462 F.3d 273 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . 54

*United States v. Paul*, 217 F.3d 989 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . 73, 74

*United States v. Pellulo*, 399 F.3d 197 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . 60

*United States v. Perdomo*, 929 F.2d 967 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . 58

*United States v. Risha*, 445 F.3d 298 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Roane*, 378 F.3d 382 (4th Cir. 2004), cert. denied, 546 U.S. 810 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*United States v. Thomas*, 221 F.3d 430 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . 53, 54

*United States v. Zuazo*, 243 F.3d 428 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . 59

*West v. Johnson*, , 92 F.3d 1385 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . 59, 61

*Wiggins v. Smith*, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . 44, 46

## FEDERAL STATUTES

21 U.S.C. § 848(g), *et seq* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

21 U.S.C. § 848(q)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

18 U.S.C. § 1111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 2253(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 4

18 U.S.C. § 3591(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

18 U.S.C. § 3592(a)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

18 U.S.C. § 3592(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 3595(c)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

18 U.S.C. § 3595(c)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

18 U.S.C. § 5003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**REGULATION**

28 C.F.R. § 540.17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NOS. 06-9000 & 06-9001

_____

UNITED STATES OF AMERICA,

Appellee/Cross-Appellant

v.

DAVID PAUL HAMMER,

Appellant/Cross-Appellee

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

BRIEF FOR THE UNITED STATES

_____

JURISDICTION

On December 27, 2005, the United States District Court for the Middle

District of Pennsylvania (Hon. Malcolm Muir) entered an opinion and order

partially granting and partially denying appellant/cross-appellee David Paul

Hammer's motion for federal collateral relief under 28 U.S.C. § 2255. JA 1-278;

*United States v. Hammer*, 404 F. Supp. 2d 676, 791-801 (M.D. Pa. 2005). The

district court vacated Hammer's death sentence but refused to set aside his guilty

plea to first-degree murder. JA 278. On January 31, 2006, the court denied the

government's motion to alter or amend the judgment. JA 279-85. Timely notices of appeal were filed by Hammer on February 7, 2006, and by the government on February 24, 2006. JA 286-89. The Solicitor General approved the government's appeal.

The district court had jurisdiction pursuant to 28 U.S.C. § 2255. This Court has jurisdiction to review the district court's order pursuant to 28 U.S.C. § 2253(a). This Court granted Hammer a certificate of appealability with regard to three questions set forth in the Issues Presented, *infra*. JA 389.[1]

## ISSUES PRESENTED

*Issues permitted by the certificate of appealability*

1. Whether counsel were ineffective for failing to investigate and present Hammer's history of false confessions and other mendacity.

2. Whether counsel were ineffective for failing to investigate and present the defense of erotic asphyxiation.

3. Whether counsel were ineffective for failing to challenge or correct the effect of the district court's pretrial order committing Hammer to long-term in-patient evaluation, and whether this claim is time-barred.

---

[1] The district court denied Hammer a certificate of appealability, JA 495, so Hammer's appeal is limited to the issues specified by this Court.

*Issues presented by the government's cross-appeal*

4.  Whether the district court erred in finding a violation of *Brady v. Maryland* and setting aside Hammer's death sentence, where both Hammer and counsel were aware of Hammer's allegedly-suppressed history of sexual bondage.

5.  Whether Hammer's claim that the jury erroneously failed to find "undisputed" mitigating factors was barred by the procedural default and non-retroactivity doctrines, and failed on its merits.

## STATEMENT OF THE CASE

In 1998, David Paul Hammer, a federal prisoner charged with killing his cellmate, pleaded guilty in the United States District Court for the Middle District of Pennsylvania to first-degree murder within the special territorial jurisdiction of the United States, in violation of 18 U.S.C. § 1111.  The plea occurred during the government's rebuttal case at Hammer's guilt/innocence trial.  JA 3869-76; *United States v. Hammer*, 25 F. Supp. 2d 518, 519-20 (M.D. Pa. 1998).  A capital penalty hearing followed, in which a jury returned a death penalty verdict.  On direct appeal, this Court granted Hammer's motion for voluntary dismissal of the appeal, *United States v. Hammer*, 226 F.3d 229 (3rd Cir. 2000), *cert. denied*, 532 U.S. 959 (2001), and denied his rehearing petition seeking reinstatement of the appeal.  *See United States v. Hammer*, 239 F.3d 302 (3rd Cir.), *cert. denied*, 534 U.S. 831 (2001).

Hammer filed his initial motion for Section 2255 relief on March 29, 2002, JA 454, which was within the one-year limitations period measured from the Supreme Court's October 1, 2001, certiorari denial.[2] *See* 28 U.S.C. § 2255. After the one-year period passed, Hammer filed a third amended Section 2255 motion, JA 477, in which he raised for the first time his present claim, see Argument III, *infra*, that trial counsel were ineffective in failing to object to the district court's pretrial order committing Hammer for an in-patient competency evaluation. JA 890-92; *see* Hammer's Opening Brief (Step-one Brief) at 63.

On the merits of Hammer's Section 2255 motion, the district court denied relief with regard to his plea-based conviction but granted relief with regard to the death sentence, based on rulings that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), and that the jury failed to find undisputed mitigating factors at the penalty hearing. JA 256-76. The district court accordingly vacated the death sentence and ordered that the case be set for a new capital penalty hearing once the government confirmed that it was still seeking the death penalty. JA 276-78; *Hammer*, 404 F. Supp. 2d at 801. The government filed that confirmation. JA 495.

---

[2] Hammer initially sought and obtained a voluntary dismissal of the Section 2255 motion, JA 462, 812, but then he appealed from the dismissal. This Court stayed an execution date that had been set and remanded the case for further proceedings. JA 964-75.

In this Court, Hammer moved to dismiss the government's appeal for lack of a final judgment. JA 391. The Court denied the motion. JA 389, 391. The Court later stayed the appeal and cross-appeal pending Hammer's certiorari petition on the jurisdictional issue. The Supreme Court denied certiorari, *Hammer v. United States*, 128 S. Ct. 43 (2007) (order), and the stay was lifted.

STATEMENT OF FACTS

A.     Guilt/innocence trial and guilty plea

1.     The guilty plea

The Government's rebuttal presentation at the conclusion of the guilt/innocence trial was interrupted by Hammer's plea of guilty to first-degree murder. JA 3869-76. The district court first held an evidentiary hearing on Hammer's competence to plead guilty. JA 3879-941. The court also conducted a colloquy with Hammer to confirm that the plea was knowingly, voluntarily, and intelligently made. JA 3869-71, 3943-65. During the colloquy, Hammer acknowledged that he had discussed the elements of first-degree murder with counsel "extensively" and that he understood them. JA 3946-47. He acknowledged that by pleading guilty he was relieving the Government of the burden of proving premeditation and other elements of murder beyond a reasonable doubt. JA 3949-51.

The Government proffered the following factual basis for the plea, JA 3955,

summarizing some of the evidence already admitted:

> [Assistant U.S. Attorney Frederick E. Martin]: . . . . The facts in the indictment that are relevant indicate that the Allenwood Penitentiary is on exclusive federal property as of April 13, 1996. And that Mr. Hammer at that location willfully with malice aforethought and with premeditation strangled Andrew Marti with a cord or a homemade garrotte.

> \* \* \*

> With respect again to the evidence, Mr. Hammer solicited Mr. Marti as a cellmate. Once Mr. Marti was his cellmate he persuaded him to engage in a hostage scenario, whereby Mr. Marti would allow himself to be tied to the bed in an effort to have Mr. Marti transferred more quickly to another federal institution.

> Mr. Hammer persuaded, or succeeded in persuading Mr. Marti to do this. Also prepared items, including cloth restraints, to facilitate the ruse, and when Mr. Marti was tied, all of his limbs were tied to various aspects of the cell, he indicated–he basically put a sock in Mr. Marti's mouth, then put him in a sleeper hold and rendered him unconscious.

> After doing so he took a cloth, a strip of cloth, and used that to finally strangle Mr. Marti to death. Mr. Hammer said to several inmates that that what–that is what he intended to do. And they have testified to that effect in this proceeding.

> He also wrote letters after the fact, after the killing of Mr. Marti, basically saying that I did what I told you I was going to do, and that was to strangle Mr. Marti, and all of these–the preplanning and the statements to the inmates, as well as Mr. Hammer's written statements following the murder support the prosecution–prosecution's conclusion that this murder occurred in cold blood with premeditation.

JA 3956-57. Hammer agreed with the proffer "in substance," JA 3957, and he

acknowledged, "I did in fact with these hands kill Andrew Marti," JA 3958.

Hammer objected to one aspect of the proffer:

> Well, the fact that I solicited [Marti] to move into my cell. It was a–it was a mutual decision for him to move in there with me, and the ruse for the hostage scenario, that was not accurate. That's something I told the FBI I did, along with Marti, braid the sheets, braid the restraints, but we used them for other purposes.

> The bottom line is I tied him up, I tied him to the bed and I killed him. And I'm responsible for that.

JA 3958. Hammer reiterated that he was guilty of first-degree murder as charged.

JA 3959, 3965. The court found Hammer competent to plead guilty and accepted

the plea. JA 3962-66.

> 2.    <u>Evidence of premeditation introduced prior to Hammer's plea</u>

The prosecutor noted that the foregoing factual proffer was intended as a

"thumbnail rendition of the evidence" of the murder, and referred the court to the

evidence already admitted as further support for a finding of premeditation. JA

3955, 3957.

In summary, the admitted evidence showed that Hammer premeditatedly

murdered fellow inmate Marti primarily in retaliation for Marti's antecedent act of

disrespect. JA 13914, 1594-614, 2098, 2203-05, 2214-27, 2498-530. Statements

that Hammer gave to the FBI and others shortly after the murder revealed that the

killing was the fruit of an elaborate deception of both Marti and the correctional

staff that Hammer carried out over an extended period of time. JA 2203-05, 2214-27, 2498-530. As indicated *infra*, Hammer's post-murder confession was corroborated in significant respects by pre- and post-murder correspondence that Hammer authored, testimony of fellow inmates and correctional staff, and physical evidence recovered from the murder scene.

        a.        <u>Hammer's 1995 encounter with Marti in the general population</u>

Hammer became an inmate at USP Allenwood in 1995.[3] JA 1619, 2180-81. For a significant portion of his time there, Hammer was confined in the Special Housing Unit ("SHU"), *see* JA 2186-97, a section where prisoners generally are held in their cells for 23 hours per day, among other restrictions, JA 1649, 2195. Hammer also spent some time in the prison's general population, where he had contact with other prisoners in the recreation yard and other common areas. JA 2205-56, 2195.

Hammer said in his post-murder confession and correspondence that, while in the general population, he came into contact with Marti, who showed

---

[3] At the sentencing, the jury was advised that Hammer was serving terms of incarceration imposed by Oklahoma state courts, JA 5031-38. The Oklahoma convictions were introduced at the penalty phase as discussed *infra*. His transfer to federal custody was pursuant to contractual provisions, JA 5648-52, and 18 U.S.C. § 5003. The Government did not introduce evidence of the length of the consecutive Oklahoma sentences was serving, which totaled 1,232 years. *Hammer*, 25 F. Supp. 2d at 548.

disrespect. JA 13914, 2227, 2525-26. In prison culture, prisoners often treat insults and personal affronts as serious matters. JA 2227. In his confession and correspondence Hammer indicated that he intended to exact revenge when the time was right, well after Marti had forgotten the incident. JA 13914, 2226-27.

Not long after Marti offended Hammer, Hammer and his fellow inmate and close friend, Brad Hosselkus, JA 2104-05, approached a special investigative agent (SIA Mark Traxler) of the Special Intelligence Office of USP Allenwood and obtained Traxler's approval for Hammer and Hosselkus to be cellmates in the SHU. JA 1911-12, 2186. Hammer (who had provided tips to SIA Traxler in connection with an internal investigation, JA 2262-68) explained to Traxler that he had been targeted by other inmates (apparently not including Marti) as a cooperator and that Hosselkus was also at risk. JA 2185-86, 3444.

b.     <u>Hammer's planning of the murder</u>

Hammer's first cellmate in the SHU after Hosselkus's March 1996 release from prison was Leonard Yager. JA 2058-59, 3443-44, 3602. Yager testified that when Marti (then assigned to the SHU) was in the SHU outdoor recreation cages, Hammer would gaze out the cell window at Marti. JA 2066-68. Hammer talked about Marti on a daily basis and mentioned wanting to have sex with Marti. JA 2068-70. Hammer also said that he intended to kill Marti. JA 2092. Yager shrugged this off as idle talk. JA 2092.

Yager testified that he served as an orderly while confined with Hammer in the SHU, which allowed Yager to work outside of his cell for approximately three hours per day, performing janitorial duties and passing out clothing and bedding to other SHU inmates. JA 2059-60, 2064, 2262-68. At Hammer's request, Yager went to Marti's SHU cell and delivered "kites" from Hammer to Marti, and also delivered kites from Marti to Hammer. JA 2076-77.[4]

After Hammer arranged to be moved out of Yager's cell and into another SHU cell, JA 2073, a new inmate, Stephen Classen, was quartered with Hammer. JA 2390. According to Classen's trial testimony, Hammer informed Classen that he could stay in Hammer's cell for a couple of weeks until "Crow" (Marti) was released from disciplinary segregation and became available to move in with Hammer. JA 2390, 2400. About nine days after Classen's arrival, Hammer sent a kite to Marti. JA 2401. Marti sent a reply kite: "I really want to be your cellee." JA 2401.

Classen testified that on the date scheduled for Marti's transfer to Hammer's cell, a fight broke out in a recreation cage, in which one inmate stabbed another with a plastic knife. JA 2402-03. Hammer became excited and screamed to other inmates that the fight was occurring. JA 2402. Hammer turned to Classen and

---

[4] The term "kite" is slang for a prisoner-to-prisoner note. JA 2401.

said, "I'm going to kill Marti." JA 2403. Noticing Classen's apparent horror, Hammer retracted by pointing at Classen and saying, "Got you." JA 2403.

Marti was moved to Hammer's cell the next day, April 9, 1996. JA 2402-03, 2497-98. Classen testified that on that day, prior to Classen's being moved from Hammer's cell, Hammer put his arm around Classen's neck and asked if Classen thought Hammer could choke him. JA 2403. Classen responded, "well, yeah," and Hammer released him. JA 2403.

Yager testified that, on one visit to Hammer's and Marti's cell, Yager noticed that Hammer was weaving a rope from torn bedsheets. JA 2087-89. Marti was also in the cell. JA 2086, 2089. Yager asked Hammer what he was doing, and Hammer gestured by drawing his thumb across the front of his throat. JA 2088-89. Yager responded, "Man, you're crazy," and resumed his rounds. JA 2088.

Hammer committed the murder shortly before the routine 3:00 a.m. census count of prisoners on April 13, 1996. JA 1661-64. According to guards it was a "quiet night" prior to the murder, JA 1662, and at the 1:00 a.m. count, there had been no indication of any problems in Hammer's and Marti's cell, JA 1661-62. A guard patrolling the SHU corridor adjacent to Hammer's and Marti's cell around 2:45 a.m. did not notice anything unusual. JA 1752-55, 3790. At the time of the murder, the restraints binding Marti to the bed prevented him from activating an

emergency "duress" button in the cell.  JA 1662-77.

The guard who arrived at Hammer's cell for the 3:00 a.m. count was Nicole Tadross-Weaver.  JA 3791.  Hammer said, "CO, turn on my light, my cellee's dead."  JA 3792.  After Hammer uncovered Marti's body, Ms. Tadross-Weaver asked why Marti was tied down, and Hammer replied, "Don't worry, he's dead; it was easier that way."  JA 3793.  Confused, Ms. Tadross-Weaver asked again why Marti was tied, and Hammer repeated, "Ma'am, it was easier that way."  JA 3794.

### c.  Hammer's post-murder statements to prison officials and the FBI

Beginning at 6:25 a.m. and ending at 8:17 a.m. on the morning of the murder, SIA Traxler, FBI Special Agent Carlyle Thompson, and others interviewed Hammer.  JA 2201-02, 2494.  Hammer orally waived *Miranda,* JA 2202, 2490-93, and confessed as follows.

Marti moved into Hammer's cell on April 9, 1996.  JA 2497-98.  Hammer had told Classen (whose cell number Hammer gave to the FBI) that he intended to kill Marti after Marti moved into his cell.  JA 2498.  Hammer also had advised Yager of the murder plan.  JA 2499.  Hammer maintained that a guard, Officer Boone, knew of the plan.  JA 2500.

Some inmates elsewhere at USP Allenwood had targeted Marti as an informant, but Hammer did not kill Marti as a "hit."  JA 2501, 2526.  Hammer

murdered Marti in retaliation for an earlier act of disrespect that Marti had forgotten. JA 2527-28.

On April 11, 1996, Hammer proposed that Marti allow Hammer to stage a hostage-taking of Marti, in which Hammer would tie Marti down and slightly hurt him. JA 2502-03, 2510. Hammer suggested that this would enable Marti to realize his desire to be returned to USP Atlanta, JA 2503, where Marti had previously been incarcerated, JA 3438-42. Marti was aware that Hammer had been involved in several prior hostage-takings in various prisons. JA 2216, 2503, 2689. Hammer offered to give Marti, among other inducements, $200 from Hammer's commissary account plus $300 from a third party. JA 2504. Hammer then began fabricating ropes to restrain Marti. JA 2511. Marti suggested that Hammer could cut Marti on the neck using a blade from a disposable razor. JA 2511.

After the 1:00 a.m. count, Hammer and Marti prepared to stage the hostage-taking. JA 2512. After a local college radio station signed off the air at 2:00 a.m., Marti laid down on Hammer's bed and Hammer tied Marti's limbs to metal restraint rings attached to the bed frame. JA 2513-15. At Hammer's request, Marti pulled at the restraints to confirm they were secure. JA 2516. Hammer lit a cigarette and gave Marti a couple of drags and then Hammer stuffed a sock into Marti's mouth. JA 2516. Hammer tied the sock in place with a strip of sheet tied

around Marti's head.  JA 2516.  Hammer got up and checked the time, 2:17 a.m. JA 2517.

While still up, Hammer noticed that Marti was twitching and whimpering; Marti said through the sock that he was having flashbacks to an incident where he was shot in the head.  JA 2517.  Hammer then straddled Marti and put his arm around Marti's neck in a "sleeper hold."  JA 2518.  Marti said, "No, please, no." JA 2519.  After Hammer held Marti for about three minutes, Marti violently pulled against his restraints.  JA 2519.  After Hammer continued the hold for approximately three more minutes, Marti was still except for intermittent shuttering.  JA 2520.  Hammer then retrieved a cloth strip (a waist-band lining from prison clothing) from Marti's bed and used it as a garrote for approximately three to four minutes "to the point that [Hammer] had received burns on his hands from the actual pressure that he applied during this period."  JA 2520-21.

Hammer stopped to wash the sweat from his hands and face.  JA 2521. Hammer then checked Marti's pulse and found none.  JA 2521.  The time was 2:40 a.m.  JA 2522.  Hammer covered Marti's body and alerted the guards when they approached for the 3:00 a.m. count.  JA 2522.

d.    Hammer's post-murder correspondence with other inmates

After the murder, Yager asked Hammer why he committed the murder; Hammer passed Yager a responding note.  That note appears at JA 13914, and

14

identified, among other grounds, Marti's prior act of disrespect. Hammer also declared in the note, "Given the opportunity, I will kill again!" JA 13914.

Hammer sent Classen a kite the day after the murder, and attempted to send a second one. JA 2422-28. In both, Hammer acknowledged his murder plan. JA 2422-28. In the second note (Government's Exhibit 35.2, seized before delivery to Classen), Hammer remarked as follows:

> Steve, I don't care what you say to the FBI or SIS. There isn't anything that can hurt me because their case is pretty much open and shut. I'm sure you were surprised to learn that I had done what I told you I was going to do to Marti.

JA 2428.

### 3. The defense claim of insanity

Hammer's theory of defense up to the guilty plea was that he was insane when he killed Marti due to "Dissociative Identity Disorder" ("DID") (formerly known as "Multiple Personality Disorder"). JA 1614-34 (guilt phase opening statement of defense counsel Ronald C. Travis). According to a defense expert, Dr. Sadoff, Hammer was controlled at various times by alter personalities including Jocko (a violent personality); Tammy (a female personality); Wilbur (a child personality); and Jasper (a chimpanzee).[5] JA 3282-84. Defense counsel

---

[5] During his post-offense statements to law enforcement officers, Hammer did not refer to himself in the plural number, mention the names Jasper, Wilbur, Tammy, or Jocko, or identify any periods of amnesia or blackouts he had

Travis also argued that the murder was not premeditated, JA 1629-33, and that Marti had been tied down to the bed for the original purpose of "kinky homosexual activity between Mr. Hammer and Mr. Marti." JA 1617.

Mr. Travis's opening statement closely tracked the facts that Hammer laid out in a defense-created videotape, in which Hammer purported to present the "Jocko" alter personality after being hypnotized by a defense expert, Dr. Louis Dubin, with Dr. Sadoff observing. JA 3331. This videotaped session enabled the defense to present to the jury, through "Jocko," a self-serving account of the murder without subjecting the defendant to cross-examination. Hammer recalled the murder as follows:

> [Dr. Dubin]: Can you describe that?
>
> [Hammer]: Yeah. He's tied to the bed in the fashion that I told you. He's dressed in a t-shirt, boxers and a pair of socks. He's lying face down, got two pillows under his head. I'm standing at the window smoking a cigarette, Andrew's lying there, he's got a gag in his mouth, but it's not tight, he can still talk, and I reach down and take the gag out of his – I say, me, because it's me, it's my body, and I give him a drag off the cigarette, put the gag back in his mouth, and I'm staring out the window, radio is on, there's music playing, and he kind of does this and shudders, and I ask him what's the matter. And he said I just had a flashback, I just had a flashback, and was wondering why I got shot in the head, and I see my head in . . . , and then I'm on his back, I've got my left arm around his neck, choking him now, and he's moving his head and he says, no, please no.

_____

suffered. JA 2529-30.

[Dr. Dubin]: What just happened David? Am I talking to David?

[Hammer]: You are now.

[Dr. Dubin]: Apparently, Jocko came out then didn't he?

[Hammer]: He didn't want to.

[Dr. Dubin]: But he did. Go ahead, David. He can hear us.

[Hammer]: He takes the rope, a piece of string, wraps it around Marti's neck, pulls it tight and he's sitting on Marti, and as he's sitting on him, Marti's body is flinching underneath him and he can feel him. He's actually, he's got a f*cking grin. It's like he's mean – he doesn't even care, he doesn't give a f*ck, he didn't care when Marti asked him no, please no, he just f*cking deserves to die.

[Dr. Dubin]: Who are we talking about, David?

[Hammer]: You know who the f*ck we are talking about.

JA 14648-49.[6]

A Government psychiatrist, James Wolfson, M.D., testified in rebuttal to the insanity defense that Hammer suffered from an antisocial personality disorder, but did not at any relevant time suffer from DID or any other major mental illness or severe mental disease or defect. JA 3686-89. Dr. Wolfson noted several inconsistencies in the videotaped hypnosis session. JA 3655-68. For example, Dr.

---

[6] The defense-prepared transcript of the hypnosis session was admitted at trial as Defense Exhibit 10, JA 3345, 3420-21, and at the Section 2255 hearing as Government Exhibit 36, JA 175. The transcript was inadvertently omitted from the appendix in this appeal, however, and the government is moving to amend the appendix to include the transcript.

Wolfson noted, Hammer accidentally used a past tense reference to the episode Hammer supposedly was re-experiencing, which was inconsistent with the way hypnosis actually works. JA 3663.

The court considered Hammer's insanity claim again at the hearing on Hammer's competence to plead guilty. *See* Part A.1, *supra*. Dr. Mitchell testified that Hammer indicated in an interview that he understood defense counsel's tactical reasons for asserting DID, but Hammer expressed personal discomfort with that diagnosis. JA 3928-29. Hammer clarified that the decision to forego the insanity defense was his personal choice and not that of any alter ego. JA 3897-98. The experts opined that Hammer was competent to waive the insanity defense and plead guilty, JA 3909, 3918, 3933, and the court so found, JA 3964.

4. <u>Evidence showing Hammer's participation in homosexual sex, and partially contradicting his post-murder confession</u>

Mr. Travis's assertion that the bindings were for "kinky homosexual activity" tracked what Hammer said in the hypnosis session, and was consistent with multiple witnesses' accounts of Hammer's homosexual activity. Virtually every one of Hammer's cellmates either had a homosexual relationship with him or discussed the possibility of homosexual sex. These included, in the order of Hammer's successive cellmates, the following:

Gary McLaughlin – JA 2871-71 (McLaughlin's defense testimony)
Mark Oberg – JA 2988 (Oberg's defense testimony)

Brad Hosselkus – JA 2105 (Yager's prosecution testimony)
Leonard Yager – 2069, 2081-85, 2125 (Yager's prosecution testimony)
Stephen Classen – 2418, 2423, 2429, 2434 (Classen's prosecution testimony)
Andrew Marti – 2068-69, 2081-85, 2092, 2127 (Yager's prosecution testimony)

Although both sides thus presented evidence of Hammer's homosexual sex with cellmates, the defense conspicuously avoided any affirmative presentation of evidence that Hammer had a history of sexual bondage of cellmates. Among the defense witnesses was Michael D. Smith, who shared a cell with Hammer in the Oklahoma State Penitentiary, and who recounted on direct examination the various alter personalities that Hammer supposedly exhibited there. JA 2777-89. On cross-examination, the government elicited evidence of Hammer's participation in sexual bondage, as follows:

> [Assistant U.S. Attorney]: [Y]ou've indicated that Hammer was into homosexual activity. That was something you were not into; is that correct?
>
> [Smith]: Yes.
>
> Q: Did he have a cellmate at some time by the name of Harmon?
>
>        *           *           *
>
> A: Yes.
>
> Q: And did they engage in homosexual activities that you observed?
>
> A: Yes.
>
> Q: And was there any tying up that had to do with that?

A: Yes.

Q: Could you tell the jury what that tying up had to do with the homosexual relationship between Mr. Harmon and Mr. Hammer?

A: Well, I seen Dave tie up a couple of his cellees before. As far as watching them engage in sexual activity, I didn't watch, you know what I mean. I'd go by, like I said, he lived across the hall from me and you could see right from my cell into their cell, and they'd have to put up their blanket up over the door, and every now and then it would come down. But occasionally, yeah, he'd have them tied up in there and leave him for a while.

JA 2801-02. The witness added that Hammer never allowed himself to be tied down. JA 2802.

On re-direct examination of Smith, the defense made no attempt to develop this evidence of bondage. Instead, defense counsel quickly shifted Smith's testimony back to Hammer's alter egos, and then dismissed Smith from the witness stand. JA 2806-08.

Both parties presented evidence contradicting parts of Hammer's post-murder confession. Both parties presented testimony that Officer Boone had no advance warning of Hammer's murder plot, contrary to Hammer's assertion. JA 2207, 2317, 2736. Hammer's counsel also attempted to refute Hammer's claim that Marti agreed to be tied up as part of a sham hostage-taking by showing that Marti knew that he was already scheduled to be transferred, JA 1616, 1952, 2298, 2305, and that inmate-on-inmate assaults ordinarily resulted in the transfer of the

20

attacker, not the victim, JA 4438.  However, as BOP employees testified at trial and the subsequent penalty hearing, no final decision had been made on Marti's potential transfer, JA 2198, 4179-80, and also the decision on whether a victim or attacker should be transferred to another prison was made on a case-by-case basis, JA 4409-11, 4438.  The relevant question was what Marti believed his chances for transfer were, and on this point Marti was aware that his last transfer, from USP Atlanta to USP Allenwood, occurred as a result of an attack in which Marti was the victim.  JA 3441-42.

B.    The capital sentencing hearing

The government's penalty phase case theory, as reflected in opening statement and closing argument, JA 3988-4008, 6034-6125, 6255-97, emphasized "two recurrent themes in David Paul Hammer's life."  JA 6034.  The first was "deceit, fraud, manipulation."  JA 6034.  Hammer's aggravating, manipulative acts, the government argued, included his 1989 "false confessions" to having set bombs at the Oklahoma City capitol and courthouse.  JA 3993.  What elevated Hammer's deceptions to a level warranting the death penalty, the government continued, was the second recurrent theme – "increasing resort to violence beginning in 1978 and continuing through 1996."  JA 6034.  These themes demonstrated Hammer's future dangerousness, a non-statutory aggravating factor alleged in the government's death penalty notice.  JA 6066-73.

The defense approach to the penalty phase was largely pre-determined by not only Hammer's guilty plea but also the defense-introduced trial evidence, including the videotaped hypnosis session and Dr. Sadoff's diagnosis. Given Hammer's statements in the hypnosis session that Jocko deliberately killed Marti, the defense did not attempt to suggest that Marti was killed accidentally in a continuation of the sex episode that ostensibly began with bondage. Instead, counsel emphasized that Hammer suffered from a mental illness, DID, brought about by years of serious childhood physical and sexual abuse, ultimately resulting in Hammer's killing Marti while under the control of the "Jocko" alter ego. JA 4014-33, 6133-255. This, defense counsel maintained, negated the statutory aggravating and intent factors that the government was required to prove for Hammer's death penalty eligibility, and also carried independent weight as statutory and non-statutory mitigating factors. JA 4014-33. Finally, in defense counsel's view, the fact that Hammer would face life imprisonment under severe security restrictions also weighed against the death penalty. JA 4025.

Before the sentencing hearing, the defense successfully moved to strike the government's aggravating factor based on Hammer's confession to the murder of Kenneth Kenner, in light of the FBI's recent discovery that Hammer did not, in fact, kill Kenner. *Hammer*, 25 F. Supp. 2d at 545-46. The government had specifically argued that despite the FBI's recent discovery, Hammer's false

confession was admissible to show his future dangerousness at the penalty phase. *Id.* Having successfully challenged that false confession, Hammer also moved in limine at trial to exclude evidence of other "stories" by Hammer that did not result in convictions. JA 431, 2931, 2956-58, 3384-87. The defense renewed this objection during the government's cross-examination. *E.g.*, JA 3384-87.

The Government's penalty phase case-in-chief included evidence of the statutory aggravating factors that the defendant had previously been convicted of two or more State or Federal offenses punishable by a term of imprisonment for more than one year, involving the use or threatened use of a firearm, 18 U.S.C. § 3592(c)(2), and that Hammer killed Marti after substantial planning and premeditation, § 3592(c)(9), JA 12-13, and the non-statutory aggravating factors of future dangerousness and victim impact, JA 13. FBI Special Agent Anthony Malocu testified that in 1978, Hammer pleaded guilty in an Oklahoma state court to pointing a weapon at another after having previously been convicted of a felony. JA 4468-69. From 1978 through the present, Hammer lived almost all of his adult life behind bars, his incarceration being interrupted mainly by multiple escapes and attempted escapes. JA 4468-75. Hammer committed additional offenses during his escapes. *See* JA 4039-46, 4468-75.

During a 1983 period of escape, Hammer kidnaped, shot, and attempted to murder Thomas Upton. JA 4473, 4039-46, 4050. The Government introduced the

Oklahoma state conviction of robbery with a firearm and shooting with intent to kill that Hammer received in 1984 for this incident. JA 4220-21, 4229, 4257-60. The Government also introduced underlying facts of the incident through Mr. Upton himself, JA 4039-46, 4050, David Walter (a reporter), JA 4051-58, and William Louis Earl Keel (an Oklahoma state prosecutor), JA 4220-21, 4229, 4257-60. Mr. Walter recounted that Hammer told him in a recorded interview (replayed for the jury) that, had he known that Upton would survive the head wounds Hammer inflicted, Hammer would "have reloaded the gun and shot him six more times." JA 4056.

The government also introduced Hammer's 1989 false claim to having planted bombs at the Oklahoma City capitol and courthouse, JA 4364-69, and his threat to kill U.S. District Judge David Russell in Oklahoma City, 4370-72. Hammer admitted that his intention was to secure a transfer from the Oklahoma State Penitentiary to the federal prison system, and Judge Russell was not, in fact, killed. JA 4383. Hammer ultimately succeeded in obtaining a transfer to federal incarceration; the Oklahoma authorities became frustrated over the amount of staff required to handle him and his repeated, successful efforts to compromise prison staff. JA 5034, *see* JA 4635, 5099-100.[7]

---

[7] On one memorable occasion while Hammer was in state custody, he obtained the credit card number of the warden of Oklahoma State Penitentiary and

A BOP staff psychologist, Stephen Karten, Ph. D., testified that he interviewed Hammer shortly after the murder of Marti and did not note "anything unusual with his mental status at all." JA 4077. Hammer did not indicate having any episodes of headaches or blackouts and did not refer to himself in the plural or evidence having any alter ego personalities. JA 4080. FBI special agents who investigated the Oklahoma City incidents, in which Hammer threatened Judge Russell and made false bomb threats, testified that Hammer did not refer to alter personalities or to himself in the plural when interviewed in connection with those incidents. JA 4363-82.

Hammer's witnesses included Michael Gelbort, Ph. D., who administered neuropsychology tests to Hammer, JA 4644-730, and John Mitchell, Psy. D., a BOP psychologist who treated Hammer, JA 4771-968. Several witnesses recalled Hammer's troubled youth and experiences while in state and federal custody. JA 4969-5155. Hammer also called BOP employees to recount the severe confinement conditions Hammer would face if he were sentenced to a life term. JA 5176-337.

The Government's rebuttal evidence included testimony indicating that, even under the highest security arrangements, inmates like Hammer can present a

---

used the number to send flowers to multiple individuals. JA 5136.

threat to guards and other inmates. *See* JA 5568, 5687-701. As a result of Hammer's manipulations and to ensure he was dealt with consistently, the Oklahoma prison system took the unusual precaution of limiting Hammer's access to staff to a handful of employees, primarily the warden, deputy warden, assistant to the warden, chief of security, and unit manager. JA 5572.

At the conclusion of the capital sentencing hearing, the jury recommended a sentence of death. JA 17. As the 18 U.S.C. § 3591(a)(2) threshold intent factor, the jury found that Hammer intentionally killed Marti. JA 12. The jury unanimously found both of the statutory aggravating factors submitted (previous convictions of two or more offenses involving the use or attempted use of a firearm and substantial planning and premeditation), JA 12-13, and both of the non-statutory aggravating factors submitted (future dangerousness and harm to the victim's surviving family), JA 13.

The jury also made findings of proffered mitigating factors, as follows. All of the factors refer to the defendant's status, and except as noted by citation, all of the factors are of the non-statutory variety (*see* 18 U.S.C. § 3592(a)(8)):

| Mitigating factor | Jurors finding the factor |
|---|---|
| Impaired capacity (§ 3592(a)(1)) | 0 |
| Duress (§ 3592(a)(2)) | 0 |
| Disturbance (§ 3592(a)(6)) | 1 |
| Presently-existing major mental disease or defect | 0 |
| Cognitive deficits | 1 |

| | |
|---|---|
| Violent and abusive childhood | 12 |
| Victim of child sexual abuse | 6 |
| Attempted to seek treatment while young | 12 |
| Would be sentenced to life without release if not death | 12 |
| Prison staff can prevent Hammer's future violence | 3 |
| Has done some good things | 5 |
| Family and friends will suffer from Hammer's death | 12 |
| Remorse | 1 |
| Acceptance of responsibility | 1 |
| Any other factor (§ 3592(a)(8)) | 0 |

JA 13-17.

C.    The hearing on Hammer's Section 2255 motion

The district court held a 32-day hearing on Hammer's Section 2255 motion.

Hammer was represented by new counsel, of course, consisting of four capital

litigators from two federal public defender offices.  JA 6714-15.  Numerous

experts testified, most of them called by the defense.[8]

---

[8]  The defense mental health experts below included Drs. Sadoff, Gelbort, and Mitchell, who reiterated and supplemented their trial testimony regarding Hammer's deficits and DID disorder.  JA 6998-7106, 7628-706, 7891-8019, 8027-73.  The defense also called the following additional mental health experts:

| Expert | Subject of testimony |
|---|---|
| Richard Kluft, M.D. JA 8535-683, 9335-487 | Additional opinion that Hammer suffered from DID |
| Donald Bersoff, Ph. D., J.D. JA 7169-504 | Opinion that Drs. Wolfson and Mitchell's testimony at the trial, competency hearing, and sentencing violated ethical standards |
| Stuart Grassian, M.D. JA 7715-883 | Opinion regarding effects of incarceration on Hammer's mental health and decision-making |

1. <u>Trial counsel's testimony on Hammer's history of false confessions</u>

The defense called Hammer's trial counsel, David Ruhnke and Ronald Travis. JA 6753-961, 8730-33, 8907-9061, 11240-338. Mr. Ruhnke was admitted to practice law in 1975 and had handled 30-to-40 capital cases. JA 8908. Mr. Travis began legal practice in 1971 and was an experienced trial litigator and partner in a law firm. JA 6755. He handled capital cases in state court before representing Hammer. JA 6755. Mr. Ruhnke met or communicated with Hammer perhaps "hundreds" of times. JA 8911. Mr. Travis spoke with Hammer "too many [times] to count." JA 6757.

Mr. Travis testified that he was aware from his pretrial investigation that Hammer had falsely implicated himself in the following offenses, among others:

| Ruben Gur, Ph. D. JA 8088-252 | Opinion that Hammer suffered from brain damage and deficits, based on MRI and PET scan imaging |
|---|---|
| Neil Blumberg, M.D. JA 8404-527 | Opinion that Hammer suffered from post-traumatic stress disorder that impacted on his competence to plead guilty and waive his direct appeal |

The government's mental health experts at the hearing were Dr. Wolfson, JA 9143-329, 9498-647, who testified at trial, and also Daryl Matthews, M.D., JA 10801-910, and Daniel Martel, Ph. D., JA 8742-900. These experts uniformly rejected the defense experts' conclusion that Hammer was insane at the time of the murder and mentally incompetent at the time of his guilty plea and appeal waiver. An ethics expert, Kenneth Kessler, Ph. D., testified, contrary to Dr. Bersoff's conclusion, that Drs. Wolfson and Mitchell's trial testimony did not violate ethical standards. JA 10435-99.

- the Kenner murder
- the so-called "two-bit murder" that Hammer said occurred in Ohio
- the "Jane Doe" murder in Chatauqua, New York
- the murder of an individual in Maryland
- a false threat to kill a trial judge
- a false threat to kill Jesse Jackson
- the murder of Karen Silkwood
- the false claim of placing a bomb at the Oklahoma City Courthouse

JA 6774-77; *see* JA 13763-918 (discovery materials provided to the defense).

Both Mr. Travis and Mr. Ruhnke viewed Hammer's false confessions as a two-edged sword, that might help the prosecution more than the defense. JA 6870, 9010-11. As Mr. Ruhnke observed,

> We were following at that point what I called a K-I-S-S principle. Keep it simple stupid. We had a confession. We had a psychiatrist who said that Hammer was mentally ill and not responsible. It did not seem to us, to start to prove a series of false confessions, some of which the jury might not think were actually false.

JA 8994. Mr. Travis echoed this sentiment, recalling his concern that if the jury heard Hammer's videotaped confession to the Kenner murder, for example, "they might not necessarily believe that it was a false confession." JA 6868; *see* JA 14037.

2.  Hammer's consideration of a defense of "accident"

Regarding the notion that Marti was killed accidentally, Mr. Ruhnke and Mr. Travis testified on cross-examination that they decided not pursue that theory after discussing the issue with Hammer. JA 6875-76, 9007-08. Hammer was

"dead set" against arguing the accident theory.  JA 9008, *see* 14039.

A defense forensic pathologist, Werner Spitz, M.D., opined at the hearing that Hammer must have killed Marti accidentally, based primarily on the fact that the ligature injured the front and sides but not the back of Marti's neck.  JA 7536-627.

In response to Dr. Spitz's testimony, the government called Saralee Funke, M.D., who performed the autopsy on Marti and previously appeared at Hammer's trial.  JA 10120-294.  Dr. Funke rejected Dr. Spitz's conclusion that Marti died accidentally during sexual activity.  JA 10170-76.  She reiterated her trial testimony that Marti's injuries were consistent with being strangled with a ligature, causing death through oxygen deprivation to the brain over a prolonged period.  JA 10132-76.  Use of a sleeper or choke hold could not be excluded. 10160-70.  Marti's body did not show visible signs of consensual, homosexual intercourse, JA 10147, 10170, and injuries on his wrists and ankles indicated that he had pulled violently against his restraints.  JA 10160, 10169-70.

3.    Evidence relating to Hammer's *Brady v. Maryland* claim

During Special Agent Malocu's testimony at the hearing below, the court directed the government to produce, for purposes of cross-examination of the agent, several previously-undisclosed FBI 302 reports pertaining to interviews of state or federal inmates who had been incarcerated with Hammer at various times.

In the main, three inmates reported that Hammer was a sado-masochistic homosexual with a fondness for bondage.

a. <u>Albert Ray Johnson</u>. Johnson occupied cells adjacent to Hammer's cells both while incarcerated in the Oklahoma State Penitentiary and later at USP Allenwood. During pretrial interviews, Johnson told agents that Hammer and his various homosexual partners would tie each other up and whip each other with ropes or electrical cords, and identified three inmates with whom Hammer had engaged in such activities. Johnson further stated that he had told Hammer how to braid sheets into ropes (Johnson used the braided ropes as clotheslines) and had provided braided ropes to Hammer on occasion; however, Johnson had been transferred from USP Allenwood to USP Atlanta a year before Marti's murder and had no knowledge of it. JA 13630-37.

b. <u>Royce Lee Fowler</u>. Before trial, the FBI interviewed Fowler, whom the defense had subpoenaed but did not ultimately call as a witness. JA 1376. Fowler told federal agents that he had been Hammer's cellmate at USP-Leavenworth for nine months, during which time Hammer told him that he liked sexual bondage and that both he and his siblings had been sexually abused by their father. JA 13638-42.

c. <u>Gaylon Don Ball</u>. Ball was housed in a cell adjacent to Hammer's cell at the time of Marti's murder. In a pretrial interview, Ball told federal agents

that he believed – without specific knowledge – that Hammer and Marti had a homosexual relationship.  Ball further reported that he had heard a female's voice outside Hammer's cell around the time that Marti was killed.  JA 13643-45.

A fourth inmate – Martin Guerrero – had been incarcerated with Hammer at USP Leavenworth prior to Hammer's transfer to USP Allenwood.  JA 13646.  Hammer had mentioned Guerrero in his incriminating statement to Agent Thompson a few hours after Marti's death.  According to Hammer, two days before Marti was murdered, Hammer sent Guerrero a letter, routed through a third-party, vouching for Marti (i.e., Hammer "did not believe the rumors [about Marti]") and requesting, as a personal favor, that Guerrero "spread the word" in order "to give Marti a chance."  JA 12239.  In a pretrial interview with federal agents, Guerrero stated that, while he knew Hammer from their days at USP Leavenworth, he had "never received a letter from Hammer or [Marti]," had "never heard of [Marti]," and had "never received a letter from [the] third party" described in Hammer's post-murder statement.  JA 13646.  The third party was Hammer's friend and pen-pal, Sam Young.  *See* JA 13870.

Mr. Ruhnke and Mr. Travis testified that, had they reviewed FBI 302 reports, they would have investigated and presented Hammer's history of sexual bondage.  JA 11243-325.  Counsel maintained that the information would have been used to corroborate Hammer's account in the hypnosis session with Dr.

Dubin that he initially restrained Marti for sexual purposes only, and to counter the government's penalty phase argument that the preparation of the restraints supported the "substantial planning and premeditation" aggravating factor.  JA 11253-54, 11302.

D.  The district court's order

1.  Hammer's ineffectiveness claims

Prior to the hearing below, the district court denied Hammer's claim that trial counsel were ineffective in failing to object to the district court's pretrial order committing Hammer for an in-patient competency evaluation.  JA 392.16-392.17, 392.22.  The court concluded that this claim was presented for the first time after Section 2255's one-year limitations period had expired, and was not allowed under the doctrines of "relation back" and "equitable tolling."  JA 392.16-392.17, 392.24.

After the hearing, the court denied Hammer's remaining ineffectiveness assertions, including the claims that trial counsel ineffectively failed to investigate and present evidence that Marti was killed accidentally, that portions of Hammer's post-murder confession were false, and that Hammer had made false confessions to other, unrelated crimes.  The court found as a factual matter that counsel were aware of Hammer's history of false confessions because the government provided the defense with the relevant documentation.  JA 146-54, 261.  Further, while

portions of Hammer's post-murder confession "may be untrue," trial counsel "did

adequately investigate the basis for the charge and appropriately relied on Mr.

Hammer's admissions during the change of plea proceeding." JA 260-61. In light

of these statements and Dr. Funke's autopsy findings,

> there was no reason for counsel to doubt the veracity of Mr.
> Hammer's admissions during the change of plea proceeding that he
> had put [Marti] in a sleeper hold, rendered him unconscious and then
> had taken a piece of cloth and strangled him. These admissions by
> Mr. Hammer were sufficient to establish malice and premeditation.

JA 261. The court found that Dr. Spitz's testimony was not "credible to the extent

that he testified that [Marti's] death occurred during a sexual experience." JA 191.

2. The *Brady* claim

The court found the previously undisclosed FBI 302 interview reports

regarding Johnson, Fowler, and Ball "constitute[d] *Brady* evidence that should

have been disclosed by the Government prior to trial," as "these statements were

material, relevant and critical to counter the Government's argument concerning

substantial planning and premeditation during the penalty phase of this case."[9] JA

251-52. Crediting the hearing testimony of Hammer's trial counsel, the court

explained that if defense counsel had been aware that Hammer had a long-standing

---

[9] Although ruling that the *Brady* violations required vacating Hammer's
death sentence, the district court rejected Hammer's claim that the undisclosed
FBI 302 interview reports would, if known, had affected his decision to plead
guilty to first-degree murder. JA 267-70.

history of sexual practices that involved bondage – particularly the use of braided

sheets in such sexual practices – counsel would have investigated Hammer's

sexual background, including "the possible defense of erotic asphyxiation," and

"very likely would have presented such evidence" at trial. JA 246-247, 252-253.

The court further found that this evidence would have been "relevant and

material" to Dr. Sadoff's testimony and in cross-examining Dr. Wolfson and other

prosecution witnesses. JA 253. Because the jurors had found two statutory

aggravating factors, but numerous mitigating factors, and because non-disclosed

*Brady* material need only affect a single juror to cause prejudice at a capital

penalty hearing (JA 265, 273), the district court concluded that "[t]he *Brady*

violations in this case taint the jury's determination that Mr. Hammer committed

the offense after substantial planning and premeditation" and that "[t]he failure of

the Government to disclose the 302 statements undermine[d] [the court's]

confidence in [the penalty phase] verdict." JA 273.[10]

---

[10] The court found the interview reports relevant in two other respects:
defense counsel would have wanted to investigate (1) whether the female voice
Ball heard around the time of the murder was that of "Tammy," Hammer's female
alter personality; and (2) the extent to which Hammer was sexually abused as a
child in light of Fowler's statement that Hammer claimed to have been sexually
abused by his father. JA 249. Ultimately, however, the court found that neither of
these pieces of undisclosed information entitled Hammer to relief under *Brady*.
The court reasoned that it was "highly likely" that the jurors would have
concluded that the female voice was that of the correctional officer who
discovered Marti's body, not an alter personality, and Fowler's statements

### 3. The jury's findings regarding mitigating factors

As an additional ground for vacating Hammer's death sentence, the district court concluded that the sentence verdict was defective due to of the jury's failure to find supposedly-undisputed mitigating factors. JA 254-56, 274-75. In so ruling, the court rejected the government's arguments that this claim was barred by the procedural default and non-retroactivity doctrines, reasoning that a grant of relief was required to avoid a "miscarriage of justice," and did not involve application of a "new rule." JA 274-75, 285, 1578-80.

The court noted that the government had not rebutted Dr. Gelbort's expert testimony that Hammer suffered from cognitive disorders or Dr. Mitchell's expert testimony that Hammer suffered from a major mental disease or defect. JA 254-256. Likewise, the district court noted that the government had not rebutted evidence indicating that Hammer was sexually abused as a child. JA 255. Finally, the district court noted that the prosecutor had conceded during the penalty phase summations that Hammer had "done certain good deeds in his life." JA 255. Notwithstanding this mitigation evidence that was either unrebutted or affirmatively conceded, the court pointed out that many or all jurors failed to find

---

regarding the sexual abuse Hammer reportedly experienced during childhood were cumulative of information of several witnesses that corroborated Hammer's claim that he was sexually abused as a child. JA 268-269.

the existence of corresponding mitigating factors.  JA 255.  For example, the district court noted that only one juror found that Hammer suffered from cognitive deficits; that only six jurors found that Hammer was sexually abused as a child; that only five jurors had found that Hammer had done some good things in his life, even though he had spent most of his adult life in prison; and that none of the jurors found that Hammer suffered from a major mental disease or defect.  JA 254-256.

## STANDARDS OF REVIEW

"[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact."  *Strickland v. Washington*, 466 U.S. 668, 698 (1984).  Accordingly, this Court decides de novo the issue of whether specific facts constitute ineffective assistance of counsel.  *United States v. Cross*, 308 F.3d 308, 314 (3d Cir. 2002).  A district court's subsidiary factual findings are reviewed for clear error.  *Strickland*, 466 U.S. at 698.

Similarly, claims under *Brady v. Maryland*, 373 U.S. 83 (1963), "present mixed questions of law and fact."  *United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006).  "This Court conducts a de novo review of the District Court's conclusions of law, and a clearly erroneous review of findings of fact."  *Id*.

The legal bars to Hammer's claims that trial counsel ineffectively failed to challenge the in-patient competency examination and that the jury erroneously

failed to find certain mitigating factors involve questions of law. *See* Arguments III & V, *infra*. This Court reviews these legal questions de novo.

SUMMARY OF ARGUMENT

On their face, the facts of Hammer's capital offense and attendant circumstances severely limited the viable defense theories available to his veteran, capital counsel. Absent some affirmative, alternative explanation, Hammer's participation and indeed premeditation in the murder of his cellmate, Andrew Marti, seemed almost inescapable, and certainly provable beyond a reasonable doubt, based on the night-time discovery of Hammer alone in a locked, two-man cell with the body of Marti, who had been bound, gagged, and strangled, all by Hammer, undisputedly. A forensic examination revealed that Marti had been injured and bruised in his mouth area and strangled for an extended period with a cloth ligature. *See* Statement of Facts, *supra*. Hammer immediately told guards that he tied Marti down to make the murder easier and promptly provided the FBI with a detailed confession to having committed the murder deliberately. *Id*. Hammer told other inmates before the murder that he wanted to have sex with Marti and also kill him, and he later sent letters confirming that he deliberately killed Marti as he had pledged. *Id*.

Given all this, any defense theory contesting guilt necessarily entailed some challenge to Hammer's post-murder confession, which Hammer's trial counsel

38

pursued to the fullest extent possible without inflicting needless damage to Hammer's own case. Attacking the confession was a necessary but not sufficient answer, however, to the government's premeditation case. Something in addition would have been necessary to rebut the ready inference of premeditation from the physical evidence (the restraints, gag, and ligature) and Hammer's admissions (including his notes and statements to other inmates). After consulting Dr. Sadoff and other experts, trial counsel settled on an insanity theory that, as a result of DID, Hammer was effectively possessed by the malevolent alter ego, "Jocko," who intentionally killed Marti. *See id.* (recounting "Jocko's" videotaped admission that he deliberately killed Marti). Further, although the insanity defense was viable regardless of the initial reason for Hammer's tying the victim down, trial counsel used Hammer's ostensibly-reliable, hypnotized statement to Dr. Dubin to argue that the initial restraints were part of "kinky" consensual bondage, after which "Jocko" deliberately killed Marti. This at least avoided admitting that Hammer had once again planned to use a "con" for secondary gain.

Even now, the defense does not dispute Dr. Sadoff's insanity diagnosis; defense experts reiterated at hearing below that Hammer suffers from DID. Nevertheless, Hammer maintains that trial counsel were ineffective in settling on the insanity theory without also investigating whether Hammer accidentally killed Marti in the course of "rough sex." Step-one Brief at 40-48. He also suggests that

trial counsel actually argued to the jury such an alternative, erotic asphyxiation theory, but ineffectively failed to investigate and present a factual basis for this defense. *Id*.

Hammer is plainly mistaken in his assertion that trial counsel presented "accident" as an alternative defense at trial. Trial counsel's argument on its face advanced "kinky sex" to explain how Marti came to be restrained, not how he was killed, and trial counsel specifically informed the jury that they were not arguing that Marti was killed by erotic asphyxia. Further, as appealing as a blended presentation of "accident" and insanity may strike post-conviction counsel, no responsible, experienced trial attorney would have pursued the two theories together in this case. Hammer was "dead set" against arguing "accident," and his videotaped, hypnotized admissions effectively foreclosed any suggestion that the murder was erotic asphyxiation. As a legal matter, having effectively settled on the DID insanity theory, counsel had no duty to investigate the conflicting erotic asphyxiation theory. Further investigation would have yielded nothing useful in any event. Thus, Hammer cannot satisfy the required elements that trial counsel's performance fell outside the wide range of professionally reasonable performance, and resulted in prejudice to Hammer's case.

For similar reasons, Hammer's assertion that trial counsel ineffectively failed to investigate and present Hammer's long history of false confessions to

various crimes fails.  Trial counsel were well aware of this history but elected not to present it.  The false confessions might have caused the jury to believe Hammer in fact committed additional crimes, and they supported the government's penalty phase theme: that Hammer's "future dangerousness" was proven by his increasing use of "deceit" and "violence."  Further, Hammer's false confessions to secure secondary gains would have bolstered the government's primary attack on the DID diagnosis: that Hammer's ultimate "con" was his dramatic, videotaped portrayal of "Jocko."

Also for similar reasons, the district court erred in granting relief on Hammer's *Brady* claim.  *Brady* does not require disclosure of information already known to the defense.  Hammer was personally aware of all of the bondage incidents recounted in the FBI 302 reports, as he was the named participant in each of the episodes described.  Trial counsel were likewise aware of Hammer's history of sexual bondage, but quickly changed the subject when defense witness Michael Smith discussed Hammer's sexual bondage on cross-examination.  As noted, erotic asphyxiation conflicted with the properly-selected insanity defense, and evidence of a long history of violent, hedonistic behavior (bondage) culminating in a deliberate murder could easily be viewed by the jury as more damning than exculpating.

The district court also erred in vacating the death sentence based on the

jury's failure to find identified mitigating factors.  That claim is barred by the procedural default doctrine and the *Teague v. Lane*, 489 U.S. 288 (1989), non-retroactivity doctrine, and lacks merit in any event.

The district court correctly concluded that the one-year statute of limitations barred Hammer's claim that trial counsel ineffectively failed to object to the court-ordered, in-patient competency evaluation of Hammer.

ARGUMENT

I. & II.

TRIAL COUNSEL PROPERLY ELECTED NOT TO PRESENT AN
"ACCIDENT" THEORY OR HAMMER'S LONG HISTORY OF
FALSE CONFESSIONS, BOTH OF WHICH RISKED SERIOUS
HARM TO HAMMER'S DEFENSE.

Hammer claims that trial counsel ineffectively failed to investigate and present evidence that Marti was killed accidentally, that portions of Hammer's post-murder confession were false, and that Hammer had made false confessions to other, unrelated crimes.  Step-one Brief at 20-48.  As the district court correctly concluded with regard to each of these claims, Hammer cannot show the required elements of unreasonably deficient performance by trial counsel and prejudice resulting therefrom.  Accordingly, Hammer's ineffectiveness assertions fail.

A.    Legal principles governing ineffectiveness claims

As the Supreme Court has made clear since *Strickland v. Washington*, 466

U.S. 668 (1984), a defendant making a Sixth Amendment ineffectiveness claim must show both that counsel's performance was so deficient as to fall "below an objective standard of reasonableness" (id. at 688), and that, as a result of counsel's unprofessional errors, "there is a reasonable probability that . . . the results of the proceeding would have been different."

The reasonableness of counsel's performance must be evaluated "from counsel's perspective at the time of the alleged error and in light of all the circumstances" (*Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986)), and without "the distorting effects of hindsight" (*Strickland*, 466 U.S. at 689). Because it is "all too tempting" for a convicted defendant to "second-guess counsel's assistance" and "all to easy" for a court to find an act or omission "unreasonable" because it was "unsuccessful," "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. Hence, courts "must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance." *Ibid.* Thus, in order to establish that his lawyer's performance was constitutionally deficient, a defendant "must overcome the 'presumption that, under the circumstances, the challenged action "might be considered sound trial strategy"'" by a reasonable attorney. *Ibid. United States v. Chandler*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc) (defendant "must establish that no competent counsel would have taken the action that his counsel

did take").

The strong presumption of reasonableness and judicial deference apply to counsel's investigative decisions. As the Supreme Court reiterated in *Wiggins v. Smith*, 539 U.S. 510, 523 (2003), defense counsel has a constitutional duty to conduct a pretrial investigation that is "reasonable[] under prevailing professional norms," which "includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. That means that, while "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[,] . . . strategic choices made after less than complete investigation" are likewise reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins*, 539 U.S. at 521, *quoting Strickland*, 466 U.S. at 690-691; *see Rompilla v. Beard*, 545 U.S. 374, 383 (2005) ("reasonably diligent counsel may draw a line where they have good reason to think further investigation would be a waste").

The choice between alternative, conflicting defenses is one instance where reasonable professional judgments support the limitations on investigation. *See Williams v. Woodford*, 384 F.3d 567, 611-12 (9th Cir. 2004) ("Having reasonably

selected an alibi defense as the primary defense theory, [counsel] no longer had a duty to investigate a conflicting mental status defense").  Because an ineffectiveness inquiry properly focuses "on the adequacy or inadequacy of counsel's actual performance, not counsel's (hindsight) potential for improvement," what the lawyer "did not miss" is "just as (or more) important as what the lawyer missed."  *See Coe v. Bell*, 161 F.3d 320, 342 (6th Cir. 1998).

In the context of a guilty plea, "in order satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

B.    Discussion

    1.    Counsel properly decided not to pursue a defense of "accident," which conflicted with the insanity defense

As noted, Hammer does not dispute Dr. Sadoff's insanity diagnosis.  Both Dr. Sadoff and Dr. Kluft reiterated at hearing below that Hammer suffers from DID, JA 8030, 8645-73, 9441-42, and Dr. Kluft concluded further that Hammer's DID "played a major role" in the murder of Marti, JA 12724.  Nevertheless, Hammer maintains that trial counsel were ineffective in settling on the DID insanity theory without also investigating whether Hammer accidentally killed Marti in the course of "rough sex."  Step-one Brief at 40-48.  He further suggests

that trial counsel actually argued to the jury such an alternative, erotic asphyxiation theory, but ineffectively failed to investigate and present a factual basis for this defense. *Id.*

Hammer is plainly mistaken in his assertion that trial counsel presented "accident" as an alternative defense at trial. Trial counsel's argument on its face advanced "kinky sex" to explain how Marti came to be restrained, not how he was killed. JA 1617. This argument was based on Hammer's ostensibly-reliable, hypnotized statement to Dr. Dubin, JA 1617, which likewise indicated that the initial restraints were part of "kinky" consensual bondage, after which "Jocko" deliberately killed Marti. JA 14649-50. On cross-examination of Agent Malocu, trial counsel specifically informed the jury that the defense did not, in fact, maintain that Marti was killed by erotic asphyxia. JA 2693. At the hearing below, Mr. Travis reiterated that the defense did not argue "accident" at trial. JA 6876.

Having settled on the admittedly-legitimate DID insanity defense, trial counsel had no duty to conduct any further investigation of "accident," because that would have conflicted with the insanity defense. *Williams v. Woodford*, 384 F.3d at 611-12. Hammer was "dead set" against arguing "accident," JA 9008, and his videotaped, hypnotized admissions effectively foreclosed any suggestion that the murder was accidental. *See Strickland v. Washington*, 466 U.S. at 691 ("when a defendant has given counsel reason to believe that pursuing certain

46

investigations would be fruitless or even harmful, counsel's failure to pursue those

investigations may not later be challenged as unreasonable"). "Jocko" recalled his

intentional killing of Marti as follows:

> He's actually, he's got a f*cking grin. It's like he's mean – he doesn't
> even care, he doesn't give a f*ck, he didn't care when Marti asked
> him no, please no, he just f*cking deserves to die.

JA 14648-49. Trial counsel evidently viewed an erotic asphyxiation theory as

harmful even apart from the conflict it created with insanity defense, as counsel

quickly changed the subject at a trial when defense witness Michael Smith

discussed Hammer's history of sexual bondage on cross-examination. JA 2801-

08. Although the bondage was obviously consistent with trial counsel's assertion

of "kinky sex," counsel by all appearances recognized that a long history of

violent, hedonistic behavior, culminating in a deliberate murder of one partner,

could easily be counted against Hammer by the jury.

Further investigation would have yielded nothing useful anyway. The

district court found as a factual matter that Dr. Spitz's forensic conclusion that

Marti died due to erotic asphyxiation was "not credible." JA 191. This finding

was not clearly erroneous, and leaves Hammer with no credible forensic opinion

supporting his accident hypothesis.

For all of these reasons, Hammer cannot satisfy the required elements that

trial counsel's performance fell outside the wide range of professionally

reasonable performance.  Hammer also cannot show that, but for counsel's errors, he would not have entered his plea.  *Hill v. Lockhart*, 474 U.S. at 59.  As the district court concluded, JA 260-61, Hammer specifically denied at the time of his plea that he and Marti were planning a sham hostage-taking and that the restraints had been made to kill Marti, but Hammer nevertheless decided to plead guilty.

2. <u>Counsel properly decided not to prove Hammer's long history of false confessions to other crimes, which would have supported the government's theory of Hammer's future dangerousness</u>

For similar reasons, Hammer's assertion that trial counsel ineffectively failed to investigate and present Hammer's long history of false confessions to various crimes fails.  The false confessions involved crimes that did not occur or were not committed by Hammer, and thus were readily distinguishable from Hammer's undisputed killing of Marti.

As the district court found, JA 146-54, 261, trial counsel were well aware of Hammer's history of false confessions.  *See* JA 6774-78; *see* JA 13763-918 (discovery materials provided to the defense).  Mr. Travis and Mr. Ruhnke confirmed that they elected not to present the information because it might cause the jury to believe Hammer in fact committed additional crimes.  JA 6868-70, 8994, 9010-11.  Trial counsel were also aware of the government's desire to use false confessions as evidence of Hammer's increasing resort to "deceit" plus "violence," which in turn showed his "future dangerousness," in the government's

48

view.  JA 6034; *Hammer*, 25 F. Supp. 2d at 545-46.  Further, presentation of

Hammer's use of false confessions to secure secondary gains would simply have

bolstered the government's primary attack on the DID diagnosis: that Hammer's

"ultimate deceit" was his dramatic, videotaped portrayal of "Jocko."  JA 6098.

For these reasons, counsel's investigation of Hammer's false confessions

and tactical decision not to present that information was neither deficient nor

prejudicial.  As the district court found, JA 261, there is no basis to conclude that

Hammer's history of false confessions, well known to both Hammer and defense

counsel, could in any way have deterred Hammer from entering his guilty plea.

*Hill v. Lockhart*, 474 U.S. at 59.

3.     <u>Counsel properly raised false aspects of Hammer's post-murder confession</u>

Hammer claims that trial counsel ineffectively failed to investigate and

prove the falsity of statements contained in his post-murder confession to the FBI.

Hammer's statements identified as false are that (a) Officer Boone had prior

knowledge of the plot to kill Marti; (b) Hammer induced Marti to stage a sham

hostage-taking so that Marti, as the victim, could secure a transfer to USP Atlanta;

(c) Hammer requested that Marti cell with him; (d) although the cell was dark,

Hammer saw the time on his unlit, digital clock; (e) Hammer sent a letter to inmate

Martin Guerrero through intermediary Sam Young, asking Guerrero to put in a

good word for Marti with potential enemies; (f) the ligature used to strangle Marti did not completely encircle Marti's neck, as evidenced by the autopsy; and (g) Hammer's shoulder dislocated while Marti was being strangled. Step-one Brief at 28-36.

As the district court concluded, Hammer has failed to show deficient performance and prejudice with regard to each of these assertions. Grounds (a) and (b) were in fact fully developed by trial counsel before the jury. Both parties refuted the assertion that Officer Boone had prior knowledge of the murder plot. *See* Statement of Facts, *supra*. And, while defense counsel attempted to show that BOP had a policy that only the aggressor inmate, not the victim, in an assault would be transferred to another facility, the government established that the decision, in fact, is made on a case-by-case basis. *Id.* Notably, Marti had been transferred to USP Allenwood after being the victim in an assault at USP Atlanta. *Id.* And, contrary to Hammer's argument, Marti was not certain at the time of the murder that his transfer back to Atlanta had been approved, as the final approval of the transfer had not yet occurred. *Id.* Thus, counsel's performance was neither deficient nor prejudicial.

Regarding who made the request for Hammer and Marti to cell together, the district court noted the evidence reflecting that both Hammer and Marti submitted requests to cell together. JA 270; *see* JA 2454, 2561, 4138, 13984. This is

entirely consistent with Hammer's post-murder confession that he requested Marti to cell with him, *see id.*, and also with the document Hammer now emphasizes indicating that Marti requested to cell with Hammer. There was no contradiction for counsel to explore, and thus no deficient performance or prejudice.

Regarding the clock, Hammer's account reflected that he was up and free to roam around the cell both before and after Marti was strangled. *See* Statement of Facts, *supra*; JA 12241. Bright lights undisputedly shined through the window of the cell, JA 6852, 10078-79, and Hammer said that he was able to see the time by looking at the clock in the window. JA 12241. Hammer produced no evidence to rebut the inference that he relied on the available light to illuminate the clock's face, whether by reflection, turning the clock, or similar means. Again, there was no contradiction here for counsel to explore, and thus no deficient performance or prejudice.

Hammer's argument concerning the Martin Guerrero letter assumes that Hammer did not, in fact, send such a letter, but this is far from evident. The truthfulness of inmate Guerrero's denial of receiving the letter is debatable and, as Mr. Travis testified below, there were "obviously a number of different explanations why Mr. Guerrero did not receive the letter, other than that it was not sent to him." JA 11272-73. The letter was sent through Sam Young, who in turn would have had to re-address the letter and relay it to Guerrero, *see* Statement of

Facts, *supra*, the purpose being to evade the legal prohibition on inmates' corresponding with inmates at other facilities. 28 C.F.R. § 540.17. The fact that the letter was contraband made interception by BOP possible, and Hammer's completion of the murder, meanwhile, increased the likelihood that the letter would not be forwarded or that the parties would deny participation to avoid being investigated. Under these circumstances, counsel's performance was not deficient or prejudicial.

Hammer's subclaim concerning his description of the ligature strangulation fails to show deficient performance and prejudice in light of the district court's factual rejection of Dr. Spitz's "accidental killing" opinion. *See* Statement of Facts, *supra*. That the back of Marti's neck did not have the same ligature injuries as were found on the front and sides takes nothing away from the undisputed fact that the ligature was sufficiently "around" Marti's neck to cause death by asphyxiation. *See id.* Thus, there was nothing in Hammer's confession on this point, JA 12242, to contradict. A post-murder examination of Hammer's hands revealed burn marks from the ligature, consistent with his confession. JA 1836-38.

Hammer also fails to show deficient performance and prejudice with regard to his statement that he dislocated his shoulder during the strangulation. Hammer told trial counsel that "Jocko" fabricated this injury. JA 8933. At the guilt phase,

trial counsel did not present the jury with that information, which would obviously draw into question "Jocko's" own credibility, a cornerstone of the insanity defense. Instead, the prosecution presented the jury with "Jocko's" alleged fabrication, again to cast doubt on Jocko's credibility. JA 3679. At the penalty phase, defense counsel repeatedly presented the alleged fabrication to the jury. JA 5357, 5418. In any event, medical records reflect that following the murder, Hammer was examined and treated for an injury to his shoulder. JA 1831-44.

III.

SECTION 2255'S LIMITATIONS PERIOD BARRED HAMMER'S CLAIM THAT COUNSEL WERE INEFFECTIVE FOR FAILING TO CHALLENGE THE COURT-ORDERED, IN-PATIENT COMPETENCY EVALUATION.

As this Court has ruled, Section 2255's one-year statute of limitations bars amendments to Section 2255 motions that present new, untimely claims for relief, as opposed to a clarification or factual supplementation of an existing, timely-filed claim. *United States v. Thomas*, 221 F.3d 430, 438 (3d Cir. 2000); *United States v. Duffus*, 174 F.3d 333, 337 (3d Cir. 1999). The district court accordingly dismissed Hammer's claim that trial counsel ineffectively failed to object to the court-ordered, in-patient competency evaluation of Hammer, which was first presented after the one-year period expired. *See* Statement of Facts, *supra*. Hammer argues that this claim was not barred because, (a) contrary to the holdings

53

of *Thomas* and *Duffus*, amendments raising new claims are timely as long as the initial Section 2255 motion was timely; (b) his present claim was timely because it "related back" to other, timely claims; and (c) even if untimely, his claim should have been allowed by equitable tolling. Step-one Brief at 48-64.

Regarding the first point, Hammer recognizes that *Thomas* and *Duffus* are binding in this case. *Id*. at 56. His argument may be rejected without further discussion. *See*, *e.g.*, *United States v. Parker*, 462 F.3d 273, 277 n.4 (3d Cir. 2006). Hammer explains that the issue is presented "to preserve it for . . . Supreme Court review," Step-one Brief at 56, but the Supreme Court has effectively rejected it already. *Mayle v. Felix*, 545 U.S. 644, 649-50 (2005).

Regarding the relation-back assertion, Hammer recognizes, Step-one Brief at 59, that an amendment that adds entirely new claims for relief (for example, adding a new claim of ineffective assistance of counsel to a petition timely alleging separate instances of ineffective assistance of counsel) is "simply not acceptable" and does not relate back. *Duffus*, 174 F.3d at 335-336, 338; *see Thomas*, 221 F.3d at 435. On the other hand, an amendment that merely "expand[s] the facts but not the claims alleged in the petition" does relate back. *Thomas*, 221 F.3d at 436. Such an amendment would be proper because it and the prior claim are "tied to a common core of operative facts." *Mayle v. Felix*, 545 U.S. at 664. The Eleventh Circuit has held that a proposed amended claim that

trial counsel was ineffective in failing to object to a summary lab report at a drug

offense trial did not relate back to the original petition alleging that counsel was

ineffective in failing to challenge the moisture content of the drugs and the lack of

sodium bicarbonate in the drugs. *United States v. Davenport*, 217 F.3d 1341,

1346 (11th Cir. 2000).

Applying these decisions, Hammer's present claim did not relate back to

any timely-presented claim. Until the untimely, third amended Section 2255

motion, he never argued that counsel were ineffective in failing to object to the in-

patient competency evaluation or, for that matter, that an in-patient evaluation

itself was improper. *See* JA 392.17, 608-10, 14673-78.[11] Rather, he argued that

the particular experts who examined Hammer should have been disqualified due to

a conflict of interest. JA 609-10, 14673-78. Hammer's amended claim,

challenging not the particular experts who examined him but rather the whole

notion of an in-patient examination and counsel's failure to raise the issue, clearly

involved a different set of "core operative facts" and thus did not relate back.

*Mayle v. Felix*, 545 U.S. at 664.

Hammer's equitable tolling argument is predicated on the alleged neglect by

---

[11] Hammer cites his second amended Section 2255 motion in connection with his relation-back argument. That motion was omitted from the appendix in this appeal, however, and the government is moving to amend the appendix to include the motion.

his prior team of court-appointed post-conviction attorneys who filed the Section 2255 motions and amendments preceding the untimely, third amended motion. Step-one Brief at 60-63. However, equitable tolling is generally reserved for extraordinary circumstances, which do not include deficient performance by federal collateral counsel. *Johnson v. Hendricks*, 314 F.3d 159, 163 (3d Cir. 2002).

Hammer cites *Fahy v. Horn*, 240 F.3d 239 (3d Cir. 2001), for the proposition that in a capital case, errors by prior Section 2255 counsel constitute "extraordinary circumstances" justifying equitable tolling. In fact, *Fahy* specifically notes, consistent with *Johnson v. Hendricks*, that deficient performance by federal collateral counsel does not amount to an extraordinary circumstance. *Fahy*, 240 F.3d at 245. Instead, the Court allowed equitable tolling based solely on the fact that in that capital case, the attorney had made a misjudgment in an unsettled area of law that, if not excused, would prevent *Fahy* from receiving any federal habeas review whatsoever. *Id*. at 244-46. The Court also emphasized that *Fahy* had diligently sought to assert all of his claims. *Id.*

Here, unlike in *Fahy*, the alleged errors would not deny Hammer review outright, and, most importantly, Hammer has not exercised diligence in asserting his claims. To the contrary, the reason for the delayed presentation was that Hammer affirmatively prohibited prior counsel from making such assertions. JA

8280-81.  Under these circumstances, the alleged attorney error by prior Section 2255 counsel does not justify equitable tolling.

Finally, Hammer is incorrect that trial counsel's alleged ineffectiveness is a basis to vacate his guilty plea.  The district court has never considered the merits of his claim, so Hammer may not receive more than a remand of the Section 2255 proceeding.  Hammer cannot show that counsel were ineffective, in part because his claim is predicated on an extension of existing law, *see Ake v. Oklahoma*, 470 U.S. 68 (1985), that is barred by the *Teague v. Lane*, 489 U.S. 288 (1989), non-retroactivity doctrine.  Additionally, Hammer's assertion that the government received an unfair resource advantage in this prosecution appears unfounded given the extraordinary expenditures that have been made on Hammer's behalf to secure representation and assistance by numerous attorneys and expert witnesses.  *See* Statement of Facts, *supra*.  The experts retained by trial counsel included Drs. Sadoff, Gelbort, Grassian, and Dubin.  *Id*.; JA 106.

IV.

THE DISTRICT COURT ERRED IN FINDING A VIOLATION OF *BRADY* AND SETTING ASIDE HAMMER'S DEATH SENTENCE, WHERE HAMMER AND COUNSEL WERE AWARE OF HAMMER'S ALLEGEDLY-SUPPRESSED HISTORY OF SEXUAL BONDAGE.

For reasons related to those discussed in Arguments I & II, *supra*, the district court erred in granting relief on Hammer's *Brady* claim.  In the court's

view, the FBI 302 reports indicating that Hammer had a history of sexual bondage supported an accident/erotic asphyxiation defense and undercut the government's assertion that the "substantial planning and premeditation" aggravating factor was shown by Hammer's pre-murder braiding of Marti's restraints. *Brady*, however, does not require disclosure of information already known to the defense. Hammer was personally aware of all of the bondage incidents recounted in the FBI 302 reports, as he participated in each of the described bondage episodes. Trial counsel were likewise aware of Hammer's history of sexual bondage, but quickly changed the subject when defense witness Michael Smith discussed Hammer's sexual bondage on cross-examination.[12] As noted, an erotic asphyxiation defense conflicted with the properly-selected insanity defense, and evidence of a long history of hedonistic bondage culminating in a deliberate murder could easily be weighed against Hammer at the penalty phase.

Almost as well-established as *Brady* itself is the related corollary that "[e]vidence is not considered to be suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. Perdomo*, 929 F.2d 967, 973 (3d Cir.

---

[12] Counsel had also interviewed and presented a number of inmate witnesses for the DID defense, who were familiar with hammer's sexual activity. *See* Statement of Facts, *supra*.

1991).  And, more specifically, the Government has had no obligation to disclose to defense counsel documents setting forth facts that the defendant himself knew or had reason to know.  *United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990) (holding that the Government did not improperly fail to disclose a witness's account that Diaz was not present at a meeting to set up a drug transaction; "[i]f in fact . . . Diaz was not in [the witness's] apartment during the transaction, Diaz knew that fact"); *United States v. Zuazo*, 243 F.3d 428, 431 (8th Cir. 2001) ("Having spent two days together with [the witness whose statements were not disclosed], Salaiza Zuazo was well aware of [the witness] and his potential testimony"); *United States v. Roane*, 378 F.3d 382, 402 (4th Cir. 2004) (because "information actually known by the defendant falls outside the ambit of the Brady rule," government did not violate *Brady* in failing to disclose statements of witnesses who assertedly could have provided defendant with an alibi, as the defendant "[o]bviously . . . knew who he was with on the evening of the [] murder" and, therefore, "had no need for the Government to provide him with such information"), cert. denied, 546 U.S. 810 (2005); *Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir. 2002) ("the state did not suppress the information that came out during Fullwood's conversation with Detective Robertson because Fullwood, better than anyone, knew about his cocaine use on the night prior to the stabbing and knew that he recounted that fact to Detective Robertson"); *West v. Johnson*,

92 F.3d 1385, 1399 (5th Cir. 1996) ("Certainly West knew whether or not had taken the necklace [as he had confessed], and necessarily knew that better than the prosecution could have"); *see United States v. Pellulo*, 399 F.3d 197, 216 (3d Cir. 2005).

As is obvious, Hammer was well aware of his own long-standing, blatant homosexual practices that involved bondage and the infliction of pain and of Albert Johnson's efforts to instruct him on the art of braiding sheets into ropes, all of which was reported in the FBI 302 reports. Hammer knew what Johnson in particular heard because Hammer and "Tony" called out to Johnson while they engaged in sex, and Johnson also personally gave Hammer a rope to use. *See id.* These basic facts were fully available to Hammer and undoubtedly known by him; the mere fact that the inmates subsequently reported the facts to investigators did not, in and of itself, provide additional, admissible exculpatory information.[13] Gaylon Ball's mere unsubstantiated suspicion that Hammer and Marti may have engaged in sex at some time when they lived together likewise did not provide additional, admissible exculpatory information that would "undermine confidence" in the jury's finding of substantial planning and premeditation and its

---

[13] Hammer's prior knowledge additionally shows that he had full ability to raise his claim as part of his original Section 2255 motion. Thus, as the government argued below, his claim is also barred by Section 2255's statute of limitations. See Argument III, *supra*.

imposition of a death sentence, in accordance with the standard of *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

The district court's efforts to avoid the controlling effect of this principle are unconvincing. Whether the defendant was aware that several inmates imprisoned with him were interviewed or that they observed his bondage-oriented homosexual activities and mentioned them to investigators is irrelevant for purposes of *Brady*. The critical factor is that Hammer was well aware of his demonstrated proclivities for bondage-oriented homosexual activities and the identities of the various inmates who had been housed in close proximity to him over his years of incarceration. Moreover, Hammer had knowledge of his own sexual activities – together with those of his various sex partners – that was far superior to that of the various inmates interviewed by the federal agents. While the district court states that Hammer's knowledge is irrelevant unless his attorneys shared in that knowledge, the fact remains that Marti was murdered under circumstances that at least suggested homosexual activity, and defense counsel certainly argued that theory to the jury at trial.[14] In such circumstances, it was

---

[14] The court's dismissal of Hammer's knowledge as irrelevant amounts to a new constitutional rule of criminal procedure that is barred in this collateral proceeding by the *Teague* non-retroactivity doctrine. *West*, 92 F.3d at 1399. The court did not have discretion to ignore the government's invocation of the *Teague* defense (JA 1572) and proceed directly to the merits of Hammer's proposed rule. *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994) ("if the state does argue that the

hardly unreasonable to expect defense counsel to quiz Hammer about his

relationship with Marti and his sexual proclivities.

Defense counsel were, in fact, well aware of Hammer's history of bondage,

but deemed it entirely unfavorable, as the cross- and redirect-examination of

Michael Smith make clear. *See* Statement of Facts, *supra*.[15] As discussed in

Arguments I & II, *supra*, presenting Hammer's sexual bondage as evidence of a

defense of accident would have conflicted with the selected defense of insanity.

That Hammer had engaged in along pattern of sexual bondage, concluding in a

deliberate murder by "Jocko," would only have served to cast the defense case in a

bad light before the jury.[16]

---

defendant seeks application of a new rule of constitutional law, the Court must apply *Teague* before considering the merits of the claim").

[15] The district court sustained defense objections to the government's cross-examination of Hammer's trial counsel below. JA 11285, 11330. These questions were intended to elicit whether defense counsel had independent knowledge of the information contained in the 302 reports. The line of inquiry was clearly relevant, and the court's preclusion of it was itself reversible error.

[16] Hammer has suggested that the government conceded in its penalty phase closing argument that, if the jury found that Marti was bound for sexual purposes, the death penalty should not be imposed. *See* JA 6267 ("If you buy off that that sock was put in [Marti's] mouth for sexual purposes, then the death penalty is not appropriate"). This mis-characterizes the prosecutor's argument. The government was instead drawing a distinction between the restraints, which defense counsel maintained were for sexual purposes, and the gag placed in Marti's mouth, which appeared unconnected to sex and thus supported the view that both the gag and restraints were being used as part of the sham hostage-taking. *See* JA 6267.

Two further points bear making.  First, even setting aside the inconsistency with the insanity defense, it is far from apparent that the FBI 302 reports contain exculpatory information.  The district court believed that the information in the reports could have undercut the basis for the substantial planning and premeditation aggravator by suggesting that Hammer might have gone through the elaborate planning – arranging for Marti to be assigned as his cellmate, braiding the ropes, and carefully tying Marti to the bunk – as a prelude to homosexual activity that included erotic asphyxiation rather than as a prelude to murder.  But, while the various FBI reports contain information about bondage and whipping, they do not refer to erotic asphyxiation as part of Hammer's sexual practices.  As noted in the Statement of Facts, *supra*, Dr. Funke found no evidence that Hammer and Marti were engaged in sexual activity while Marti was restrained; at most, the presence of traces of Marti's sperm along his own lip line suggests that he engaged in antecedent sexual activity.  More importantly, Albert Johnson's 302 reports contained information that strongly supported the existence of the substantial planning and premeditation aggravating factor: according to Johnson, Hammer stated that he planned to kill a cellmate while incarcerated at Allenwood to ensure that he would not be returned to the Oklahoma prison system, adding that he would be able to avoid legal liability for such a killing by reason of mental incompetency.  JA 13636.

Second, in concluding that, if disclosed to the defense, the FBI 302 reports would likely have resulted in a non-death verdict, the district court placed undue importance on the role of the substantial planning and premeditation aggravator in the jury's deliberations, while minimizing the evidentiary basis for the factor. As the Supreme Court made clear in *Strickler v. Greene*, 527 U.S. 263, 289-296 (1999), a defendant's burden of establishing that he was prejudiced by the non-disclosure of exculpatory information is not easily met, even with regard to the penalty phase of a capital trial at which a single juror can prevent imposition of a death sentence. As the Court stated in *Strickler*, the pertinent question is not whether the undisclosed information might have changed the outcome of the trial; rather, a defendant must convincingly show that "'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense," thereby placing "the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 289-290.[17]

---

[17] In *Strickler*, prosecution witness Anne Stolzfus testified in "vivid" detail regarding the abduction of the murder victim from a shopping mall parking lot, describing the victim and the victim's vehicle, and positively identified Strickler and his two companions as the abductors. Strickler was convicted of capital murder and sentenced to death. After trial, a series of police interview notes surfaced that cast considerable doubt on Stolzfus' memory of the abduction and her ability to identify the victim, the victim's car, the abductors, or the roles the abductors played. Although concluding that the undisclosed interview notes were exculpatory, the Court held that there was no reasonable probability that the non-disclosure of the interview notes would have affected the outcome of either guilt

Even assuming that the undisclosed FBI 302 reports contained exculpatory information that was not already well known to Hammer, the district court was wrong in ruling that Hammer made the requisite demonstration of prejudice to entitle him to relief. To begin, this is not a case in which the substantial planning and premeditation aggravator served as the sole factor establishing eligibility for the death penalty. Hammer's two prior felony convictions for offenses involving the use or threatened use of a firearm indisputably established Hammer's death eligibility as well. Moreover, given Hammer's post-offense admissions and the Rule 11 evidentiary proffer to which he agreed, it is highly unlikely that a reasonable juror would have failed to find the existence of the substantial planning and premeditation aggravating factor if presented with evidence that Hammer had a history of engaging in homosexual practices that involved the restraint of his sex partners with braided ropes. Nor is there a reasonable probability that the

---

or penalty phases of Strickler's trial. In so doing, the Court noted that Strickler's conviction and death sentence did not depend on whether he played the primary role in the abduction; that, even though Stolzfus gave the only disinterested, narrative account of the abduction, there were other eyewitnesses who placed Strickler at the mall before the offense and in the victim's car after the offense, as well as "considerable forensic and other physical evidence linking [Strickler] to the crime" (*id*. at 293-94); that Strickler's eligibility for the death penalty did not depend on Stolzfus' testimony; and that, for penalty phase purposes, Stolzfus' description of Strickler as a violent, aggressive person was not nearly as powerful as the evidence showing the vileness of the murder, his callousness following the murder, and the likelihood that he would constitute a future danger to society. *Id*. at 292-96.

undisclosed information would have affected the jury's penalty phase determination in light of the evidence showing that Hammer had repeatedly been convicted of violent felonies and continued to pose a menace as a life-sentenced prisoner held in a special confinement unit. In this regard, we note that in assessing the probable impact of the non-disclosure of the FBI 302 reports, the district court essentially discounted in full the substantial planning and premeditation factor and treated the case as if the jury had found the existence of only one other statutory aggravating factor (i.e., Hammer's multiple convictions for violent felonies involving firearms); however, the court ignored that the jury additionally found as non-statutory aggravating factors that Hammer posed a future danger (a particularly powerful factor, given Hammer's penchant for committing violent crimes while confined in highly restrictive conditions) and that his murder of Marti had an adverse impact on Marti's family. In short, the possible that prejudice resulted from the non-disclosure of the FBI 302 reports is far less likely here than in *Strickler*.

V.

HAMMER'S CLAIM THAT THE JURY ERRONEOUSLY FAILED TO FIND "UNDISPUTED" MITIGATING FACTORS WAS BARRED BY THE PROCEDURAL DEFAULT AND NON-RETROACTIVITY DOCTRINES, AND LACKED MERIT.

As noted, Hammer successfully moved to dismiss his direct appeal only

after both parties filed their briefs addressing, inter alia, his claim that the jury erroneously failed to find supposedly-undisputed mitigating factors. JA 1386-1403. The district court nevertheless relied on this ground as a basis to vacate Hammer's death sentence. JA 274-75.

Especially given Hammer's voluntary dismissal of this same claim on direct appeal, the procedural default doctrine precluded relief for the claim on federal collateral review. *See Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669, 2682 (2006) ("The general rule . . . is that a defendant who fails to raise a claim on direct appeal is barred from raising that claim on collateral review"). And, as the reason for the abandonment of the issue was Hammer's own voluntary decision, and not the result of constitutionally deficient legal representation, Hammer clearly cannot establish the requisite "cause" and "prejudice" that would excuse his procedural default of the issue. *United States v. Frady*, 456 U.S. 152, 162-166 (1982).

Nor did the district court believe Hammer could satisfy *Frady*'s "cause" and "prejudice" standard. The court instead held that non-consideration of his claim on collateral review would result in a "fundamental miscarriage of justice" and excused Hammer's procedural default on that basis. JA 274-75. That determination is at odds with this Court's earlier decision in this case holding that review of death sentences under the FDPA is permissive and not mandatory. *Hammer*, 226 F.3d at 236-37; JA 13365-66. Moreover, it is contrary to the

Supreme Court's case law that has "explicitly tied" the "miscarriage of justice" exception "to the petitioner's innocence" to ensure that the exception would "remain 'rare' and would only be applied in 'extraordinary cases.'" *Schlup v. Delo*, 513 U.S. 298, 328 (1995). There is nothing in this case to demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Bousley v. United States*, 523 U.S. 614, 623 (1998); *Schlup v. Delo*, 513 U.S. at 324, 326-327; *Murray v. Carrier*, 477 U.S. 478, 496 (1986). And, while the Court has recognized a procedural "gateway" for capital prisoners who can show that they are "actually innocent" of the death penalty, that "gateway" is crossed only if a petitioner demonstrates "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992).

Even accepting the district court's wrongheaded premise that a court may set aside a death sentence if the jurors "erroneously" fail to unanimously find the existence of asserted mitigating factors, that constitutional "error" has absolutely nothing to do with Hammer's eligibility for the death penalty, which was established by two statutory aggravating factors that were well supported by the evidence. Mitigating factors are merely selection criteria that aid the jury in deciding whether a death-eligible defendant should be sentenced to death or life

imprisonment. *See Tuilaepa v. California*, 512 U.S. 967, 972-73 (1994). Because of that, an error with regard to mitigating factors will never establish that a prisoner is "actually innocent of the death penalty" and thereby entitled to skirt his procedural default.[18]

Even if the claim were not procedurally defaulted – or, more precisely, even if Hammer's procedural default could be excused, consideration of the mitigating factor finding claim is barred under the principles of *Teague v. Lane*, 489 U.S. 288, 301 (1989). *Teague* generally precludes the application of a new constitutional rule of criminal procedure in a Section 2255 proceeding, unless the proposed rule falls within an exception to non-retroactivity. *See Bousley*, 523 U.S. at 620-21.

The Supreme Court has never imposed a requirement that jurors give mitigating effect to a proffered factor in exercising guided discretion to determine the appropriate sentence in a capital case; rather, the Constitution requires only that jurors not be precluded from considering and giving effect to relevant mitigating evidence. In *Lockett v. Ohio*, 433 U.S. 586, 604 (1978) (plurality opinion), and *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982), the Court recognized that, as a constitutional matter, a capital sentencer – in federal practice,

---

[18] A holding that the procedural default doctrine does not bar this claim would constitute a new constitutional rule of criminal procedure, which itself would be barred by the *Teague* non-retroactivity doctrine, discussed *infra*.

the jury – may not be prevented from considering, as a mitigating factor, any

aspect of the defendant's background and character or the circumstances of his

offense that the defendant proffers as a basis for imposing a sentence less than

death.  Drawing on this principle, the Court in *Penry v. Lynaugh*, 492 U.S. 302,

328 (1989), held that a capital sentencer must also be able to give effect to any

mitigating evidence that is relevant to a defendant's background and character or

the circumstances of his offense.  *Accord*, *Oregon v. Guzek*, 546 U.S. 517, 526

(2006).  And, in *Mills v. Maryland*, 486 U.S. 367 (1988), and *McCoy v. North

Carolina*, 494 U.S. 433 (1990), the Court held that the Eighth Amendment

requires that individual jurors be able to determine for themselves the existence

and weight to be accorded any mitigating factor.

These various constitutionally-based requirements regarding mitigating

factors do not, however, impede on the ability of the States and the federal

government "to structure and shape consideration of mitigating evidence."  *Guzek*,

546 U.S. at 526, quoting *Boyde v. California*, 494 U.S. 370, 377 (1990).  As the

Supreme Court noted at length in *Buchanan v. Angelone*, 522 U.S. 269, 276-77

(1998) (some internal citations omitted):

> In the selection phase, our cases have established that the
> sentencer may not be precluded from considering, and may not refuse
> to consider, any constitutionally relevant mitigating evidence . . . .
> However, the State may shape and structure the jury's consideration
> of mitigation so long as it does not preclude the jury from giving

effect to any relevant mitigating evidence . . . . Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence. Thus, in *Boyde v. California*, 494 U.S. 370 (1990), we held that the standard for determining whether jury instructions satisfied these principles was "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id*. at 380.

But we have never gone further and held that the State must affirmatively structure in a particular way the manner in which juries consider mitigating evidence. And, indeed, our decisions suggest that complete jury discretion is constitutionally permissible. *See Tuilaepa*, [512 U.S.] at 978-79 (noting that at the selection phase, the State is not confined to submitting specific propositional questions to the jury and may indeed allow unbridled discretion); [*Zant v.*] *Stephens*, [462 U.S. 862, 875 (1983)] (rejecting the argument that a scheme permitting the jury to exercise "unbridled discretion" in determining whether to impose the death penalty after it has found the defendant eligible is unconstitutional, and noting that acceptance of that argument would require the Court to overrule *Gregg* [*v. Georgia*, 428 U.S. 153 (1976)]).

The Federal Death Penalty Act is consistent with these principles. In particular, in contrast to its treatment of aggravating factors, the FDPA does not require the jury to return "special findings" regarding the mitigating factors found to exist or the number of jurors who concurred in the existence of a particular factor. Rather, Section 3593(d) provides (emphasis added):

Return of Findings – The jury, or if there is no jury, the court, shall consider all the information received during the hearing. It shall return special findings identifying any aggravating factor or factors set forth in section 3592 found to exist and any other aggravating factor for which notice has been provided under subsection (a) found

to exist.  A finding with respect to a mitigating factor may be made by 1 or more members of the jury, and any member who finds the existence of a mitigating factor may consider such factor established for purposes of this section regardless of the number of jurors who concur that the factor has been established.

This same dichotomy between aggravating factors and mitigating factors is carried forward in the FDPA's appellate review provisions.  The FDPA thus provides, inter alia, that a death sentence is subject to reversal if "the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor."  18 U.S.C. § 3595(c)(2)(B).[19]  No comparable provision exists requiring appellate review of mitigating factor findings made by individual jurors or mandating reversal of a death sentence in the event the jurors do not unanimously find a particular mitigating factor to exist.

In light of the language and structure of the FDPA, the courts of appeals that have considered the question have uniformly doubted their authority to review the failure of a jury to unanimously find the existence of an asserted mitigating factor.  *See United States v. Bernard*, 299 F.3d 467, 485-86 (5th Cir. 2002) (questioning authority to review jury findings regarding mitigating evidence, as "the FDPA does not require the jury to make specific findings of the existence of, or degree of

---

[19]  Vacation of a death sentence is also required if it "was imposed under the influence of passion, prejudice, or any other arbitrary factor" or because "the proceedings involved any other legal error requiring reversal of the sentence that was properly preserved for appeal under the rules of criminal procedure."  18 U.S.C. § 3595(c)(2)(A), (C).

jury unanimity upon, mitigating factors"); *United States v. Paul*, 217 F.3d 989, 999-1000 & n.6 (8th Cir. 2000) ("We question whether we are able to review the jury's findings regarding the number of jurors who found a particular mitigator because the FDPA does not require the jury to return special findings showing which mitigating factors that jury found to exist or the number of jurors who found a particular mitigator"); *United States v. Hall*, 152 F.3d. 381, 413 (5th Cir. 1998) (because FDPA does not require "special findings" to be made regarding mitigating factors, court "question[s] whether the juror's failure to find a particular mitigating factor constitutes a proper subject for appellate review").[20] As these cases further make clear, "[n]either the FDPA nor *Lockett* and *Eddings* require a

---

[20] By contrast, in a case decided under the now-repealed Title 21 capital sentencing procedures, 21 U.S.C. § 848(g), *et seq*., the court of appeals in *United States v. McCullah*, 76 F.3d 1087, 1112-13 (10th Cir. 1996), reviewed a jury's non-unanimous finding regarding an asserted mitigating proffer. Unlike the FDPA's review provisions, however, the Title 21 review provision expressly required appellate courts to determine that "the information supports the special finding of the existence of every aggravating factor upon which the [death] sentence was based, . . . or the failure find[] any mitigating factors as set forth or allowed in this section." 21 U.S.C. § 848(q)(3)(B). Comparable language regarding the review of mitigators was tellingly omitted from the later-enacted FDPA. Nor was the absence of comparable language inadvertent. The bill containing the Title 21 capital procedures was drafted before the Supreme Court's decision in *Mills*, and the initial draft of the bill required the jury to unanimously find the existence of any mitigating factor and further provided for appellate review of the jury's failure to make such a finding. After *Mills* was decided, the jury-findings provision of the draft was modified to allow a single juror to find and consider any mitigating factor, but the logical parallel change was not made in the bill's review provisions. The FDPA was not afflicted with this problem.

capital jury to give mitigating effect or weight to any particular evidence." *Paul*, 217 F.3d at 999. Hence, even though the factual predicate for a mitigator was uncontroverted, both the Fifth and the Eighth Circuits have held that jurors were constitutionally and statutorily free whether a particular set of facts has mitigating force in a particular case. *See Bernard*, 299 F.3d at 485-86 (as long as jurors were free to give mitigating effect to defendants' ages, jurors were not required to find that defendants' youthfulness was mitigating); *Paul*, 217 F.3d at 999-1000 (although defendant was 18 years old and his codefendant received a life sentence, jury not required to give mitigating effect to either factor); *Hall*, 152 F.3d at 413 ("jury was free to believe or disbelieve" testimony of family members that defendant experienced a difficult upbringing that mitigated against imposition of a death sentence). *Cf.*, *Tuileapa*, 512 U.S. at 975-80 (jury may consider defendant's age as either mitigating or aggravating seriousness of offense). Viewed against this backdrop, (1) the jury's failure to unanimously find the existence of a proffered mitigating factor was not subject to judicial review, and (2) in any event, the jurors were entirely free discount defense testimony supporting the various factors or to determine that the factors did not mitigate Hammer's offense.

The district court's holding that the jurors were obligated to unanimously find the existence of mitigating factors that it believed were undisputed or conceded and then vacating Hammer's death sentence because of that perceived

error constitutes a new constitutional rule of criminal procedure that "breaks new ground" and "imposes a new obligation" in federal capital practice. *Teague*, 489 U.S. at 301. Under *Teague*, such a new rule may not be retroactively applied on collateral review.

Nor does a newly-announced requirement subjecting less-than-unanimous mitigating factor findings to judicial review satisfy *Teague*'s exception for new "watershed" procedural rules. *Cf.*, *Beard v. Banks*, 542 U.S. 406, 417 (2004) (rule in *Mills* invalidating capital sentencing schemes that precluded individual jurors from considering mitigating factors unless unanimously found by the entire jury not a "watershed" rule); *Schriro v. Summerlin*, 542 U.S. 348, 417 (2004) (rule in *Ring* requiring jurors to find the existence of eligibility factors in capital cases not a "watershed" rule). The new rule applied by the district court here – requiring jurors to unanimously find the existence of any mitigating factor that the court deems to be "conceded" or "undisputed," even though jurors could, in any event, give little or no weight to the factor in their selection determination – seems far less central to the accuracy and fundamental fairness of capital sentencing proceedings than the rules found to be non-retroactive in *Banks* and *Summerlin*. Indeed, the Supreme Court has only regarded new rules that are on par with the right of counsel to be of "watershed" significance. The rule here is plainly not of that caliber.

CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court reverse the judgment of the district court insofar as the court vacated Hammer's death sentence, and affirm the judgment insofar as the court denied relief with regard to the guilty plea.

Respectfully submitted,

MARTIN C. CARLSON
United States Attorney
Middle District of Pennsylvania

FREDERICK E. MARTIN
Assistant U.S. Attorney
Middle District of Pennsylvania

/s/ Gwynn X Kinsey, Jr.

_____
GWYNN X KINSEY, JR.
Capital Case Unit
Criminal Division
U.S. Department of Justice
Room 336
1331 F Street, N.W.
Washington, D.C. 20530
Telephone: (202) 353-9721
Fax: (202) 353-9779
Email: Gwynn-Charlie.Kinsey@usdoj.gov

Dated: January 3, 2008

## CERTIFICATE OF BAR MEMBERSHIP

I HEREBY CERTIFY pursuant to Third Circuit Local Rule 46.1 that my name appears on this brief as counsel for Appellee and that I am a member of the bar of this Court.

/s/ Gwynn X Kinsey, Jr.

_____

GWYNN X KINSEY, JR.


## CERTIFICATE OF WORD COUNT, IDENTICAL COMPLIANCE, AND VIRUS CHECK

I HEREBY CERTIFY that (a) this brief contains 18,194 words, and that, by a motion filed on December 28, 2007, the government has requested leave to file a brief containing no more than 20,000 words; (b) the text of the electronic brief filed in this case is identical to the text of the paper copies of the brief; and (c) on this 3d day of January, 2008, I ran the McAfee VirusScan Enterprise, version 5200.2160, virus detection program on the file containing this electronic brief, and it indicated that no virus was detected.

/s/ Gwynn X Kinsey, Jr.

_____

GWYNN X KINSEY, JR.


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3d day of January, 2008, copies of the foregoing Brief for the United States were served on Appellant's counsel by overnight commercial delivery addressed to:

Anne L. Saunders, Esquire
Office of the Federal Public Defender
100 Chestnut Street, Suite 306
Harrisburg, PA 17101-2540

Michael Wiseman, Esquire
Federal Court Division
Capital Habeas Corpus Unit
Defender Association of Philadelphia
Curtis Center Building, Suite 545 West
Independent Square West
Philadelphia, PA 19106

/s/ Gwynn X Kinsey, Jr.

_____

GWYNN X KINSEY, JR.