# ATTACHMENT A

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

RICHARD THOMAS STITT, a/k/a
Patrick V. Hardy, a/k/a Tom Tom,

*Defendant-Appellant.*

No. 07-11

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

RICHARD THOMAS STITT, a/k/a
Patrick V. Hardy, a/k/a Tom Tom,

*Defendant-Appellee.*

No. 07-12

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Raymond A. Jackson, District Judge.
(2:98-cr-00047-JBF)

Argued: September 24, 2008

Decided: December 24, 2008

Before WILLIAMS, Chief Judge, and MOTZ
and SHEDD, Circuit Judges.

Affirmed in part; reversed and remanded in part with instructions by published opinion. Chief Judge Williams wrote the opinion, in which Judge Motz and Judge Shedd joined.

---

## COUNSEL

**ARGUED:** Gerald Thomas Zerkin, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Richard Thomas Stitt. Richard Daniel Cooke, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for the United States. **ON BRIEF:** Michael S. Nachmanoff, Federal Public Defender, Alexandria, Virginia; Amy L. Austin, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia; Jeffrey L. Stredler, WILLIAMS MULLEN, Norfolk, Virginia, for Richard Thomas Stitt. Chuck Rosenberg, United States Attorney, Alexandria, Virginia; Darryl J. Mitchell, Assistant United States Attorney, William D. Muhr, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for the United States.

---

## OPINION

WILLIAMS, Chief Judge:

We granted Richard Thomas Stitt, a federal inmate, a certificate of appealability ("COA") to consider his claim that during the guilt phase of his federal capital proceeding, his trial counsel labored under a conflict of interest that adversely affected his representation. By way of cross-appeal, the Government argues that the district court, after granting Stitt relief under 28 U.S.C.A. § 2255 (West Supp. 2008) as to the penalty phase of his trial and vacating his death sentence, erred by concluding that Stitt was no longer eligible for the death penalty because the statute under which Stitt's death sentence

was imposed has since been repealed, *see* 21 U.S.C.A. § 848(g) (West 1999) (repealed 2006), and by sentencing Stitt to life imprisonment. We agree with the district court that Stitt is not entitled to relief as to his guilt-phase conflict of interest claim, but we conclude that the district court erred by finding that § 848(g) was not saved by the general Savings Statute, 1 U.S.C.A. § 109 (West 2005). Accordingly, we vacate Stitt's life sentence and remand the case for a new sentencing hearing.

## I.

In 1998, a jury sitting in the Eastern District of Virginia convicted Stitt of three counts of murder during a continuing criminal enterprise, in violation of 21 U.S.C.A. § 848, as well as numerous other federal drug and firearms offenses in Virginia and North Carolina.[1] *See United States v. Stitt*("*Stitt I*"), 250 F.3d 878, 881-82 (4th Cir. 2001). Following a penalty phase conducted pursuant to § 848(g), the jury recommended a death sentence for each of the murders, and the district court sentenced Stitt to death plus 780 months imprisonment. We affirmed Stitt's conviction and sentence on direct appeal. *Stitt I*, 250 F.3d at 900.

On May 12, 2003, Stitt filed a timely motion under 28 U.S.C.A. § 2255 to vacate his conviction and sentence. In his § 2255 motion, Stitt raised two claims relevant to the current appeal. First, Stitt contended that his trial counsel, Norman Malinski, labored under a conflict of interest at the guilt phase of Stitt's trial. Specifically, Stitt claimed that Malinski failed to conduct an investigation or hire appropriate experts to

---

[1]Stitt was tried jointly with Kermit Brown, Robert Mann, and Percell Davis. The trial lasted almost two months and established that Stitt was the leader of a drug organization responsible for distributing more than 150 kilograms of crack cocaine in Portsmouth, Virginia and Raleigh, North Carolina from 1990 to 1998. The three murder charges were based upon the killings of James Griffin, Sinclair Simon Jr., and James Gilliam, Jr., all of which occurred in Virginia.

4                    UNITED STATES v. STITT

investigate the alleged criminal acts that occurred in North Carolina. Stitt claimed that Malinski failed to do so because, under the fee agreement between him and Malinksi, any expense payments were to come from the retainer paid to Malinski, and Malinski wanted to keep that money. Second, Stitt argued that Malinski was likewise under a conflict of interest during the penalty phase of Stitt's trial. This claim focused on Malinski's decision to hire an "expert" on future dangerousness whose only knowledge of federal prisons came from watching a television program. Stitt argued that Malinski hired this "expert" instead of asking the district court to appoint an expert in order to keep the district court from delving into Malinski's fee agreement with Stitt.[2]

Following two evidentiary hearings, the district court entered an order denying all of Stitt's claims except the claim that Stitt had been denied his right to conflict-free counsel during the penalty phase of his trial. *Stitt v. United States* ("*Stitt II*"), 369 F. Supp. 2d 679 (E.D. Va. 2005). Accordingly, the district court vacated Stitt's death sentence. Both sides appealed. We granted Stitt a COA on a single claim—whether Malinski had an actual conflict of interest at the guilt phase. We initially affirmed the district court's denial of relief as to Stitt's guilt-phase conflict of interest claim and its grant of relief as to his penalty-phase conflict of interest claim. *United States v. Stitt* ("*Stitt III*"), 441 F.3d 297 (4th Cir. 2006). Prior to the issuance of our mandate, however, we withdrew our opinion in *Stitt III*, concluding that we lacked jurisdiction to hear the appeal because "there is no final judgment 'until the prisoners are resentenced.'" *United States v. Stitt* ("*Stitt IV*"), 459 F.3d 483, 485 (4th Cir. 2006) (quoting

---

[2]Indeed, the financing arrangement between Malinski and Stitt remains shrouded in mystery to this day. During trial, the Government contended that Malinski received more than $500,000 in drug money to defend Stitt. While Malinski contested the Government on this point, during the evidentiary hearings he was unable to verify how much he was paid or who paid him to represent Stitt.

*Andrews v. United States*, 373 U.S. 334, 340 (1963)). We remanded the case to the district court with instructions to resentence Stitt.

On remand, the district court *sua sponte* entered an order requesting the parties to brief the following question:

> Although 21 U.S.C. § 848(i)(1) contemplates the impaneling of a new jury for the purpose of a capital resentencing, can this Court exercise its "broad and flexible § 2255 remedial power," *United States v. Hillary*, 106 F.3d 1170, 1172 (4th Cir. 1997), to "correct the sentence as may appear appropriate," 28 U.S.C. § 2255, and resentence Petitioner without application of the Death Penalty.

(J.A. at 1774.)

Following briefing, the district court answered its question in the affirmative and declined to empanel a new sentencing jury for the penalty phase, concluding that Stitt was no longer statutorily eligible for the death penalty. The district court reached this conclusion after finding that § 848(g), which had been repealed during the pendency of Stitt's appeals, could no longer apply to Stitt and that the Federal Death Penalty Act, 18 U.S.C.A. § 3591 *et seq.* ("FDPA"), did not provide a mechanism for empanelling a new sentencing jury. *Stitt v. United States* ("*Stitt V*"), 475 F. Supp. 2d 571 (E.D. Va. 2007). In the alternative, the district court concluded that, even if it had the statutory authority to call a new sentencing jury, it would exercise its discretion under § 2255 and decline to do so. *Id.* at 576. Accordingly, the district court, from the bench, resentenced Stitt to life imprisonment plus 780 months.

Both Stitt and the Government filed timely appeals. Pursuant to *United States v. Hadden*, 475 F.3d 652 (4th Cir. 2007),[3]

---

[3] In *United States v. Hadden*, 475 F.3d 652 (4th Cir. 2007), we explained:

6    UNITED STATES v. STITT

Stitt requested a COA from this court on two issues: whether Malinski labored under an actual conflict of interest during the guilt-phase of the trial that adversely affected his representation and whether Stitt was denied his right to learned counsel. By order dated June 12, 2008, we granted Stitt a COA on his conflict of interest claim.

Meanwhile, in its appeal, the Government no longer contests the district court's decision to grant Stitt relief as to his claim that Malinski labored under a conflict of interest during the penalty phase. Instead, the Government confines its appeal to whether the district court's resentencing decision was error. We possess jurisdiction over the Government's appeal pursuant to 18 U.S.C.A. § 3742(b) (West 2000) and 28 U.S.C.A. § 1291 (West 2006).

## II.

## A.

We first address Stitt's claim that Malinski had an actual conflict of interest during the guilt phase of Stitt's trial that

---

Because a § 2255 resentencing or correction of the prisoner's sentence thus bears traits of both a § 2255 proceeding and a criminal action, we conclude that an order entering the result of such a resentencing or an order correcting the prisoner's sentence is a hybrid order that is both part of the petitioner's § 2255 proceeding and part of his criminal case.

*Id.* at 664.

Thus, "[t]o the extent the order formally completes the prisoner's § 2255 proceeding, it is part of that proceeding, and, accordingly, a prisoner's appeal of that aspect of the order is an appeal of a § 2255 proceeding." *Id.* And, before we can entertain that appeal, the prisoner "must obtain a COA under § 2253." *Id.* But, "[t]o the extent the order vacates the original sentence and enters a new criminal sentence . . . the order is part of the petitioner's criminal case." *Id.* Thus, under *Hadden,* Stitt's appeal is part of his § 2255 proceeding, while the Government's appeal is part of Stitt's original criminal case.

adversely affected his representation. We review the district court's legal conclusions in denying a § 2255 motion *de novo*. *United States v. Poindexter*, 492 F.3d 263, 267 (4th Cir. 2007). Where the district court held an evidentiary hearing prior to its ruling, we review its findings of fact for clear error. *United States v. Roane*, 378 F.3d 382, 395 (4th Cir. 2004).

Generally, in order to show ineffective assistance of counsel, Stitt would be required to meet the familiar two-part *Strickland* test: (1) that his lawyer afforded him defective representation; and (2) that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). But, when counsel is burdened by an actual conflict of interest, he "breaches the duty of loyalty, perhaps the most basic of counsel's duties." *Id.* at 692. In such cases, "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Id.* Because of this difficulty in measuring prejudice and the seriousness of a conflict of interest, "[p]rejudice is presumed . . . if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance." *Strickland*, 466 U.S. at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348, 350 (1980)) (internal quotation marks omitted).

Thus, in order to fall within the *Sullivan* presumption, we have explained that a defendant must demonstrate "an actual conflict of interest" that "result[s] in an adverse effect on counsel's performance." *United States v. Tatum*, 943 F.2d 370, 375 (4th Cir. 1991) (emphasis omitted). These requirements "are often intertwined." *Id.* But, an "[a]dverse effect cannot be presumed from the mere existence of a conflict of interest." *Rubin v. Gee*, 292 F.3d 396, 401 (4th Cir. 2002). Only if Stitt can meet these two requirements does he qualify

for *Sullivan*'s presumption of prejudice. *See Sullivan*, 446 U.S. at 348-49; *Rubin*, 292 F.3d at 401-02.

B.

Stitt's claim before us is that Malinski labored under a financial conflict of interest that kept him from retaining investigators in North Carolina during the guilt phase of Stitt's trial. In particular, Stitt contends that, under the financial agreement between him and Malinski, Malinski was required to pay for all case-related expenses out of his own pocket and that Malinski, not wishing to incur the costs of an out-of-state investigator, thus declined to pursue any investigation in North Carolina.

Stitt's claim raises an intriguing procedural point; in *Stitt III*, we granted Stitt a COA on this claim but denied relief, concluding that Stitt could show neither an actual conflict nor an adverse effect. *Stitt III*, 441 F.3d at 305-06. Although we later vacated that opinion, *see Stitt IV*, 459 F.3d at 484, we did not purport to question the reasoning we used in denying Stitt's claim.

In an effort to avoid our conclusion in *Stitt III*, Stitt has brought forth evidence that an investigation in North Carolina would have been a reasonable choice. In particular, Stitt argues that Count One of the indictment against him, which alleged a conspiracy to distribute in excess of 50 grams of crack, in violation of 21 U.S.C.A. § 841(a)(1) (West 1999) and 18 U.S.C.A. § 2 (West 2000), listed 48 overt acts occurring in North Carolina. Likewise, Stitt argues, two key Government witnesses, Marcus Reid and Sadat Muhammad, testified extensively and almost exclusively about Stitt's drug operations in North Carolina.

Even were we to assume, however, that Stitt's evidence on this point satisfies the "adverse effect" prong of *Sullivan*,[4] Stitt

---

[4]To establish the existence of an adverse effect, a defendant must satisfy a three-part test:

has still failed to rebut the district court's explicit factual finding that "there is no indication that the money Malinski received for his representation was directly correlated to money that would be paid for experts or other fees and costs." *Stitt II*, 369 F. Supp. 2d at 692. The district court expressly found that Malinski and co-counsel Franklin Schwartz "were paid flat fees for their services, with costs and expenses to be paid as they arose. . . . Petitioner's family agreed to raise the money for any additional costs and expenses." *Id.* at 691. Stitt contends, as he did previously, that this factual finding is clearly erroneous given that the district court also found "Malinski was evasive and not credible in answering questions about the source of the funds, his expenditures, and his record-keeping." *Id.* at 692. As Judge Motz succinctly wrote for this court in our later-withdrawn opinion in *Stitt III*,

> This finding does not contradict the district court's further finding that Malinski was not credible in some respects; it simply evidences that the district court found Malinski credible as to some issues, but not others.

*Stitt II*, 441 F.3d at 306.

We believe this reasoning remains applicable today and, accordingly, we cannot find that the district court clearly erred

---

First, the petitioner must identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued. Second, the petitioner must show that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision. . . . Finally, the petitioner must establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict.

*Mickens v. Taylor*, 240 F.3d 348, 361 (4th Cir. 2001) (en banc), *aff'd*, 535 U.S. 162 (2002).

in accepting Malinski's explanation as to the source of his funding during the guilt phase. With this factual finding in place, Stitt cannot show an "actual conflict," and we therefore affirm the district court's denial of this claim.

## III.

In its cross-appeal, the Government contends that the district court committed reversible error in refusing to empanel a new sentencing jury for Stitt after it granted him relief on his penalty-phase conflict of interest claim. The Government's cross-appeal involves questions of law, which we review *de novo*. *United States v. Tate*, 524 F.3d 449, 455 (4th Cir. 2008). In declining to empanel a new sentencing jury, the district court first concluded that it lacked the statutory authority to do so before further concluding that, even if such authority existed, it would use its broad equitable powers under § 2255 to resentence Stitt without a jury.

Thus, the Government points to what it believes are two statutes authorizing the empanelment of a new sentencing jury for Stitt, § 848(g) and the FDPA, 18 U.S.C.A. § 3593(c). The Government further contends that, under § 2255, the district court was not permitted to resentence Stitt without calling a new sentencing jury. We address each contention in turn.

## A.

### i.

When Stitt was initially sentenced to death in 1998, his death sentence was authorized by 21 U.S.C.A. § 848(e)(1)(C), which provides "any person engaging in or working in furtherance of a continuing criminal enterprise ("CCE"), . . . who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results . . . may be sentenced to death." Section 848(g) provided that "[a] person shall be subjected to the penalty of

death for any offense under this section only if a hearing is held in accordance with this section." Section 848(i)(1) authorized a sentencing hearing, providing that, if the Government filed its notice of intent to seek the death penalty and a defendant was found guilty under subsection (e), "the judge who presided at the trial . . . shall conduct a separate sentencing hearing to determine the punishment to be imposed." 21 U.S.C.A. § 848(i)(1). The statute further provided that the sentencing hearing "shall" take place "before the jury which determined the defendant's guilt." § 848(i)(1)(A). Stitt's initial sentencing hearing was conducted in accordance with the remainder of § 848.

In 2006, however, prior to Stitt's resentencing, §§ 848(g)-(r) were repealed by Congress and § 848(e) offenses were made death penalty eligible in accordance with the FDPA. *See* Pub. L. 109-177, 120 Stat. 231, 232. *See also* 18 U.S.C.A. § 3591(a) (noting a "defendant who has been found guilty of . . . any other offense for which a sentence of death is provided" is to have a hearing held under § 3593 to determine whether imposition of a death sentence is proper).

Section 3593 further provides that, subject to several enumerated exceptions, when a defendant is found guilty of a capital offense a separate penalty hearing "shall be conducted" before the jury that determined the defendant's guilt. The exceptions are in cases where: (A) the defendant pled guilty; (B) the defendant was convicted at a bench trial; (C) "the jury that determined the defendant's guilt was discharged for good cause;" or (D) "after initial imposition of a sentence under this section, reconsideration of the sentence under this section is necessary." 18 U.S.C.A. § 3593(b)(1)-(2).

The Government first argues that Stitt may be resentenced by a new capital sentencing jury under § 3593(b)(2)(D).[5] We

---

[5]At oral argument, the Government also pressed 18 U.S.C.A. § 3593(b)(2)(C), which permits the calling of a new jury for sentencing when the first was excused for "good cause," as authorizing a new sentencing jury for Stitt. The Government did not fully develop this argument in its brief, however, and we decline to address it.

disagree. Subparagraph (D), by its clear terms, permits a second sentencing jury only when the initial sentence was imposed "under this section." Stitt's original sentencing hearing was conducted under § 848, not the FDPA. However broadly one reads the phrase "under this section," it plainly cannot be read to encompass a sentence imposed under § 848, which appears in a different Title of the United States Code. We are not permitted to ignore the statute's plain language. *See Sigmon Coal Co. v. Apfel*, 226 F.3d 291, 308 (4th Cir. 2000) *aff'd*, 534 U.S. 438 (2002) ("[E]ven if . . . the literal text of the statute produces a result that is, arguably, somewhat anomalous—we are not simply free to ignore unambiguous language because we can imagine a preferable version."). Accordingly, we agree with the district court that § 3593(b)(2)(D) did not authorize the empanelling of a new sentencing jury in this case.

ii.

We thus turn to the Government's alternative argument, that §§ 848(g)-(r) are saved against Stitt and authorize convening a second sentencing jury. In particular, the Government contends that, because § 848(e) maintained death eligibility for defendants like Stitt, it would be anomalous to conclude that there are no statutory mechanisms for holding a new capital sentencing proceeding. In contrast, Stitt argues that, as the district court concluded, the Savings Statute saves only substance, not procedures like those encompassed in § 848.

The Savings Statute, 1 U.S.C.A. § 109, provides:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution

for the enforcement of such penalty, forfeiture, or
liability.

1 U.S.C.A. § 109.

Originally passed in 1871, the statute serves to undo the
common law rule of abatement. As the Supreme Court has
explained:

> At common law, the repeal of a criminal statute
> abated all prosecutions which had not reached final
> disposition in the highest court authorized to review
> them. Abatement by repeal included a statute's
> repeal and re-enactment with different penalties.
> And the rule applied even when the penalty was
> reduced.

*Bradley v. United States*, 410 U.S. 605, 607-08, 93 S.Ct. 1151
(1973) (citations omitted). In order to avoid this common law
rule, "often the product of legislative inadvertence," Congress
enacted the Savings Statute. *Warden, Lewisburg Penitentiary
v. Marrero*, 417 U.S. 653, 660 (1974). The *Marrero* Court
explained that the Savings Statute "does not ordinarily pre-
serve discarded remedies or procedures," just the penalties,
liability, and forfeitures—the "punishment" of the prior stat-
ute. *Id.* at 661-62. Thus, the *Marrero* Court held that a "no-
parole provision" in a federal drug statute was "an element of
. . . punishment" saved by § 109. *Id.* at 662. As *Marrero* sug-
gests, courts have generally understood § 109 to save "merely
substantive rights and liabilities," but not "remedies" or "pro-
cedure." *United States v. Obermeier*, 186 F.2d 243, 254-55
(2d Cir. 1950).

Consistent with *Marrero*, we have explained that, under the
Savings Statute, "a liability that arises under a later-repealed
statute is preserved despite repeal and may be enforced by a
post-repeal action." *Korshin v. Comm'r*, 91 F.3d 670, 673 (4th
Cir. 1996). *See also United States v. Brown*, 429 F.2d 566

(5th Cir. 1970) ("[P]enalties accruing while a statute was in force may be prosecuted after its repeal"). For example, in *United States v. Cook*, 890 F.2d 672, 675-76 (4th Cir. 1989), we followed the logic of *Marrero* to hold that a later-repealed "no probation" provision in a federal drug statute was saved because "probation, if imposed, must be imposed as part of the sentence pronounced at the sentencing hearing, [and accordingly] it is included within the definition of 'any penalty.'" *Id.* at 676. Summarizing, we explained that because probation was not available as a sentencing option at the time Cook committed her crime, "section 109 prevents a statutory change in offense classification that occurs between the time of the violation and subsequent sentencing from making probation an available penalty at sentencing." *Id.*

Accordingly, we followed our earlier pronouncement "that the term 'penalty' in section 109 'embraces . . . the *sentence* imposed by the court.'" *Id.* (quotation marks omitted) (emphasis added). Likewise, other courts have indicated that "sentencing is an integral part of the 'prosecution' of the accused, as that term is used in § 109, and therefore that *§ 109 saves sentencing provisions* in addition to substantive laws." *United States v. Smith*, 354 F.3d 171, 175 (2d Cir. 2003) (emphasis added).

In a similar vein, the Supreme Court has explained, in saving a later-repealed statute, that:

> [W]here the object of Congress was to destroy rights in the future while saving those which have accrued, to strike down enforcing provisions that have special relation to the accrued right and as such are part and parcel of it, is to mutilate that right and hence to defeat rather than further the legislative purpose.

*De La Rama S S Co. v. United States*, 344 U.S. 386, 390 (1953).

The Court reasoned that "[l]egal obligations that exist but cannot be enforced are ghosts that are seen in the law but that are elusive to the grasp." *Id.* at 390 (quoting *The Western Maid*, 257 U.S. 419, 433 (1922)). The *De La Rama* Court further noted that when considering "the repeal of statutes which create rights and also prescribe how the rights are to be vindicated," terms like "substantive and procedural are not disparate categories; they are fused components of the expression of a policy." *De La Rama*, 344 U.S. at 390. Thus, in that case, "the right created by the repealed statute and the procedure for enforcing that right were so bound together that section 109 could not fully preserve the right without also preserving the procedure." *Barthelemy v. J. Ray McDermott & Co.*, 537 F.2d 168, 172 (5th Cir. 1976).

We think that this case law leads inexorably to the conclusion that §§ 848(g)-(r) are saved by the Savings Statute. First, as noted, courts are in agreement that "sentencing provisions" are saved as part of the "prosecution" of a "penalty" even when a later change alters the availability of a particular sentence. Thus, in *Cook*, we continued to apply the original sentencing options even though a change in offense classification created new alternatives at Cook's resentencing. Likewise, in this case we continue to apply the original sentencing provisions because the repeal of §§ 848(g)-(r) would have the effect of eliminating a previously-available sentencing option, a death sentence, at the resentencing.

Second, and perhaps more importantly, just like in *De La Rama*, the penalty provided in § 848(e) cannot be fully preserved without also preserving the mechanisms for enforcing it, §§ 848(g)-(r). Indeed, the repealed portions of § 848 are a constitutionally required condition precedent to imposing § 848(e)'s penalty of a death sentence. *See, e.g., Ring v. Arizona*, 536 U.S. 584, 609 (2002) (noting that the Sixth Amendment requires aggravating circumstances be proven to jury because they "operate as the functional equivalent of an element of a greater offense"); *Maynard v. Cartwright*, 486 U.S.

356, 362 (1988) ("[O]ur cases have insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action."). This constitutional mandate, derived from the fact that "death is different," indicates that in cases involving capital sentencing, the procedures attendant to that capital sentencing are part of the "penalty" saved by the general Savings Statute because, without these procedures, that penalty is extinguished as a matter of constitutional law. *Ring*, 536 U.S. at 606.

Accordingly, because the "enforcing provisions" of § 848(g)-(r) are both akin to a "sentencing provision" and also have a constitutionally mandated "special relation to the accrued right," the Savings Statute operates to save them against Stitt. And, § 848(i)(1)(B)(iv) provided for the empanelling of a sentencing jury in cases where the original death sentence was later vacated. Thus, the district court erred by concluding that it lacked the statutory authority to convene a new sentencing jury.

## B.

In the alternative, the district court concluded that, even assuming it possessed statutory authority to convene a new penalty-phase jury for Stitt, it would use its equitable § 2255 powers and decline to do so. The operative provision of § 2255 provides as follows:

> If the court finds . . . there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

28 U.S.C.A. § 2255(b).

This language "confers a 'broad and flexible' power to the district courts 'to fashion an appropriate remedy.'" *United States v. Hillary*, 106 F.3d 1170, 1171 (4th Cir. 1997) (quoting *United States v. Garcia*, 956 F.2d 41, 45 (4th Cir. 1992)). The "most appropriate remedy," we have explained, "is to put § 2255 defendants in the same boat as direct appellants, i.e., to permit resentencing." *Id.* at 1172. "[T]he defendant may be 'placed in exactly the same position in which he would have been had there been no error in the first instance.'" *Id.* at 1172 (quoting *United States v. Silvers*, 90 F.3d 95, 99 (4th Cir. 1996)).

We review a district court's use of its equitable powers under § 2255 for abuse of discretion, focusing upon whether the district court's choice was "appropriate." *Id.* Although we recognize the broad discretion the district court possesses in crafting a remedy under § 2255, we must find that it abused that discretion in this case. Section 848(i) provided that, if the Government files the appropriate death-eligibility notice (which it did in 1998), and if the defendant is found guilty of the death eligible offenses (which Stitt was in 1999), then "the judge who presided at the trial . . . *shall* conduct a separate hearing to determine the punishment to be imposed." 21 U.S.C.A. § 848(i)(1) (emphasis added). That hearing "*shall*" be conducted "before a jury impaneled for the purpose of the hearing if . . . after initial imposition of a sentence under this section, redetermination of the sentence under this section is necessary." 21 U.S.C.A. § 848(i)(1)(B)(iv) (emphasis added). And, if a jury recommends a sentence of death, "the court *shall* sentence the defendant to death." 21 U.S.C.A. § 848(l) (emphasis added). Given the repeated use of the term "shall," we believe it was not "appropriate" for the district court to forego empanelling a new penalty-phase jury.

The district court's decision also conflicts with our admonition that the defendant be placed in the "same position" as if

18                   UNITED STATES V. STITT

there was no error. In this case, that position would be await-
ing a penalty phase after having been convicted of death-
eligible offenses. The district court's justification, the time
between the initial death penalty hearing and the resentencing,
fails to recognize that Congress, by providing in § 848(i) that
a second penalty phase "shall" be held when the original death
sentence is later overturned, has already legislatively
addressed that concern.

## IV.

The decision of the district court denying Stitt habeas relief
as to his guilt-phase claims is affirmed. Because, however, the
Savings Statute saves § 848(g), we believe the district court's
decision to sentence Stitt to life imprisonment plus 780
months without calling a new sentencing jury must be
reversed, and we remand the case for a new capital sentencing
hearing conducted pursuant to § 848(g).

*AFFIRMED IN PART; REVERSED AND*
*REMANDED IN PART WITH INSTRUCTIONS*

**ATTACHMENT B**

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

Nos. 07-11, 07-12

UNITED STATES OF AMERICA,

*Appellee/Cross-Appellant,*

v.

RICHARD THOMAS STITT,

*Appellant/Cross-Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia
at Norfolk
*The Honorable Raymond A. Jackson, District Judge*

BRIEF OF THE UNITED STATES

| | |
|---|---|
| Chuck Rosenberg<br>United States Attorney | Richard D. Cooke<br>Assistant United States Attorney<br>600 East Main Street, Suite 1800 |
| Darryl J. Mitchell<br>William D. Muhr<br>Assistant United States Attorneys | Richmond, Virginia 23219<br>(804) 819-5400 |

*Attorneys for the United States of America*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARGUMENT

I.    When Congress replaced the death-penalty procedures in 21 U.S.C
      § 848 with those in the Federal Death Penalty Act—while expressly
      retaining death eligibility under § 848(e)—Congress did not eliminate
      the death sentence for defendants like Stitt who face resentencing for
      a § 848 offense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      B.    Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

            1.    The Savings Statute, 1 U.S.C. § 109, preserves the sentencing
                  procedures in § 848 needed to enforce death eligibility under
                  § 848(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            2.    If the Savings Statute does not preserve the death-sentencing
                  procedures in § 848, then the Federal Death Penalty Act
                  applies. Statutes must be read together, and repeals by
                  implication must be clear and manifest. . . . . . . . . . . . . . . 34

II.    The district court's equitable powers in granting relief under § 2255 neither permitted the court to ignore binding statutes nor authorized the court to place the defendant in a better position than he would have been absent his defense counsel's error. . . . . . . . . . . . . . . . . . . . . . . . 41

    A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    B.    Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

III.    Given that Stitt never sought appointment of learned counsel under 18 U.S.C. § 3005, that the learned-counsel provision does not even apply to defendants like Stitt who retain their own counsel, and that defense counsel did not lie about his capital experience, defense counsel's statements about his capital experience were irrelevant to his keeping his fee and never triggered a conflict of interest that violates the Sixth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    B.    Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

IV.    The district court did not clearly err in finding that Stitt's lawyers were paid with a flat fee and correctly held that no Sixth Amendment violation occurred from the decision not to hire guilt-phase investigators in North Carolina and Florida. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

    A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

    B.    Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

STATEMENT OF ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . 68

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

ii

# TABLE OF AUTHORITIES

**CASES**                                                                  **Page**

*Banks v. Dretke*, 383 F.3d 272 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Booth-El v. Nuth*, 288 F.3d 571 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 40

*Bradley v. United States*, 410 U.S. 605 (1973) . . . . . . . . . . . . . . . . . . . . . . . 29

*Branch v. Smith*, 538 U.S. 254 (2003) . . . . . . . . . . . . . . . . . . . . . . . . 35, 36, 43

*Burger v. Kemp*, 483 U.S. 776 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Clark v. Arizona*, 126 S. Ct. 2709 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Collins v. Youngblood*, 497 U.S. 37 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Cuyler v. Sullivan*, 446 U.S. 335 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . passim

*De La Rama S.S. Co. v. United States*, 344 U.S. 386 (1953) . . . . . . . . . . . . 32, 33

*Dobbert v. Florida*, 432 U.S. 282 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Duncan v. Walker*, 533 U.S. 167 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Evans v. Thompson*, 881 F.2d 117 (4th Cir. 1989) . . . . . . . . . . . . . . . . . . . . 40

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) . . . . . . . . . . 36

*Felker v. Turpin*, 518 U.S. 651 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Harried v. United States*, 389 F.2d 281 (D.C. Cir. 1967) . . . . . . . . . . . . . . 50, 53

*Harvin v. Rushton*, 104 Fed. Appx. 315 (4th Cir. 2004) . . . . . . . . . . . . . . . . 48

*Hill v. BASF Wyandotte Corp.*, 696 F.2d 287 (4th Cir. 1982) . . . . . . . . . . . . . 48

*Hyman v. Aiken*, 824 F.2d 1405 (4th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . 3, 48

*LeCroy v. Sec'y, Fla. Dep't of Corrs.*, 421 F.3d 1237 (11th Cir. 2005) . . . . . . . . 3

*Lettieri v. Equant Inc.*, 478 F.3d 640 (4th Cir. 2007) . . . . . . . . . . . . . . . . . 48, 59

*Mickens v. Taylor*, 240 F.3d 348 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 58

*Mickens v. Taylor*, 535 U.S. 162 (2001) . . . . . . . . . . . . . . . . . . . . . . 57, 58, 64

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) . . . . . . . . . . . . . . . . . . . . . . 4, 48, 59

*Morton v. Mancari*, 417 U.S. 525 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Phelps v. Alameda*, 366 F.3d 722 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . 48, 59

*Red Rock v. Henry*, 106 U.S. 596 (1883) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Ring v. Arizona*, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Rodriguez v. United States*, 480 U.S. 522 (1987) . . . . . . . . . . . . . . . . . . . . . 32

*Rompilla v. Beard*, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Rose v. Lee*, 252 F.3d 676 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 4, 40

*Rowe v. Director, Dept. of Corrections*, 111 Fed. Appx. 150 (4th Cir. 2004) . . 47

*Rubin v. Gee*, 292 F.3d 396 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Shabani v. United States*, 513 U.S. 10 (1994) . . . . . . . . . . . . . . . . . . . . . . . 65

*Slack v. McDaniel*, 529 U.S. 473 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Stitt v. United States*, 369 F. Supp.2d 679 (E.D.Va. 2005) . . . . . . . . . . . . . passim

*Stitt v. United States*, 475 F. Supp.2d 571 (E.D.Va. 2007) . . . . . . . . . . . . . passim

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . 24, 52

*Swisher v. True*, 325 F.3d 225 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*TRW, Inc. v. Andrews*, 534 U.S. 19 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Warden v. Marrero*, 417 U.S. 653 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*Watt v. Alaska*, 451 U.S. 259 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Arache*, 946 F.2d 129 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . 61

*United States v. Barnette*, 390 F.3d 775 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . 34

*United States v. Boone*, 245 F.3d 352 (4th Cir. 2001) . . . . . . . . . . . . . . 49, 52, 54

*United States v. Borden Co.*, 308 U.S. 188 (1939) . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006) . . . . . . . . . . . . . . . 38, 46

*United States v. Burns*, 990 F.2d 1426 (4th Cir. 1993) . . . . . . . . . . . . . . 46, 55, 63

*United States v. Cook*, 890 F.2d 672 (4th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Cueto*, 628 F.2d 1273 (10th Cir. 1980) . . . . . . . . . . . . . . . . . . 61

*United States v. Dyess*, 478 F.3d 224 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . 45

*United States v. Fausto*, 484 U.S. 439 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Freeman*, 44 U.S. 556 (1845) . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Green*, 407 F.3d 434 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . 38, 46

*United States v. Gonzalez-Lopez*, 126 S. Ct. 2557 (2006) . . . . . . . . . . . . 50, 53, 64

*United States v. Hadden*, 475 F.3d 652 (4th Cir. 2007) . . . . . . . . . . . . . . 3, 4, 44

*United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) . . . . . . . . . . . . . . . . . 34, 40

*United States v. Hillary*, 106 F.3d 1170 (4th Cir. 1997) . . . . . . . . . . . . . 9, 41, 44

*United States v. Jackson*, 327 F.3d 273 (4th Cir. 2003) . . . . . . . . . . . . . . . . . 34

*United States v. Koon*, 518 U.S. 81 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Korshin*, 91 F.3d 670 (4th Cir. 1996) . . . . . . . . . . . . . . . . 30, 33

*United States v. Locklear*, 829 F.2d 1314 (4th Cir. 1987) . . . . . . . . . . . . . . . . 61

*United States v. Lovasco*, 431 U.S. 783 (1977) . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Lovely*, 175 F.2d 312 (4th Cir. 1949) . . . . . . . . . . . . . . . . . . 30

*United States v. Massino*, 302 F. Supp.2d 1 (E.D.N.Y. 2003) . . . . . . . . . . . . . .53

*United States v. Murray*, 65 F.3d 1161 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . 61

*United States v. Morrison*, 449 U.S. 361 (1981) . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Nelson*, 484 F.3d 257 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . 24

*United States v. Nicholson*, 475 F.3d 241 (4th Cir. 2007) . . . . . . . . . . . . . . . . 47

*United States v. Parr*, 516 F.2d 458 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . 61

*United States v. Pregent*, 190 F.3d 279 (4th Cir. 1999) . . . . . . . . . . . . . . . . . 43

*United States v. Russell*, 971 F.2d 1098 (4th Cir. 1992). . . . . . . . . . . . . . . . . . 62

*United States v. Schaefer*, 120 F.3d 505 (4th Cir. 1997). . . . . . . . . . . . . . . . . . 30

*United States v. Silvers*, 90 F.3d 95 (4th Cir. 1996) . . . . . . . . . . . . . . . . . . . 44

*United States v. Smith*, 433 F.2d 341 (4th Cir. 1970) . . . . . . . . . . . . . . . . . . . 30

*United States v. Stitt*, 250 F.3d 878 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 2, 6, 7

*United States v. Stitt*, 441 F.3d 297 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . 2, 24, 58

*United States v. Stitt*, 459 F.3d 483 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . passim

*United States v. Talebnejad*, 460 F.3d 563 (4th Cir. 2006) . . . . . . . . . . . . . . . . 37

*United States v. Taveras*, 436 F. Supp.2d 493 (E.D.N.Y. 2006) . . . . . . . . . . . . 26

*United States v. Watson*, 496 F.2d 1125 (4th Cir. 1973) . . . . . . . . . . . . . . . . . . 52

*United States v. Williams*, 544 F.2d 1215 (4th Cir. 1976) . . . . . . . . . . . . . . . . . 54

*United States v. Young*, 424 F.3d 499 (6th Cir. 2005) . . . . . . . . . . . . . . . . . 38, 46

**STATUTES**

1 U.S.C. § 109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

18 U.S.C. § 922 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

18 U.S.C. § 924 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 3005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 3591 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 25

18 U.S.C. § 3593 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 3742 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

21 U.S.C. § 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

21 U.S.C. § 848 ................................................. passim

28 U.S.C. § 1291 .................................................. 3

28 U.S.C. § 2255 ............................................... passim

**RULES**

Fed. R. App. P. 22(b)(3) ........................................... 2

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

Nos. 07-11, 07-12

---

UNITED STATES OF AMERICA,

*Appellee/Cross-Appellant,*

v.

RICHARD THOMAS STITT,

*Appellant/Cross-Appellee.*

---

Appeal from the United States District Court
for the Eastern District of Virginia
at Norfolk
*The Honorable Raymond A. Jackson, District Judge*

---

BRIEF OF THE UNITED STATES

---

## JURISDICTIONAL STATEMENT

Richard Thomas Stitt was convicted in 1998 and sentenced to death plus

780 months in prison for three counts of murder during a continuing criminal

enterprise and ten counts of related drug and firearm offenses. The murder counts

were based on the killings of three people—James Griffin on September 27, 1993,

Sinclair Simon, Jr., on October 27, 1994, and James Gilliam, Jr., on September 8,

1996. At the penalty phase, the jury unanimously found all of the statutory aggravating factors and 40 non-statutory aggravating factors. Joint Appendix (JA) 1268-1325. On direct appeal, this Court affirmed the conviction and death sentence, and the Supreme Court denied certiorari. *United States v. Stitt*, 250 F.3d 878 (4th Cir. 2001), *cert. denied*, 535 U.S. 1074 (2002).

A full account of the jurisdiction for the present appeal, which arises out of Stitt's habeas proceedings, requires some procedural background. After Stitt filed a motion under 28 U.S.C. § 2255 and an evidentiary hearing was conducted, the district court upheld Stitt's conviction but vacated his death sentence for ineffective assistance of counsel. *Stitt v. United States*, 369 F. Supp.2d 679 (E.D.Va. 2005). Both Stitt and the government appealed, and this Court initially affirmed the conviction and the grant of a new penalty phase. *United States v. Stitt*, 441 F.3d 297 (4th Cir. 2006). But this Court withdrew its opinion soon after it was filed and concluded that jurisdiction for the appeal was lacking until Stitt was resentenced. *United States v. Stitt*, 459 F.3d 483 (4th Cir. 2006).

On remand, the district court concluded that the government would be prohibited, however, from seeking a death sentence and refused to empanel a new penalty-phase jury. *Stitt v. United States*, 475 F. Supp.2d 571 (E.D.Va. 2007). The district court then sentenced Stitt to life plus 780 months on June 15, 2007 and entered its judgment on June 22, 2007. JA 43-44, 1855. Stitt timely filed a

2

notice of appeal from that judgment on June 28, 2007, and the United States timely filed a cross-appeal on July 2, 2007. JA 44, 1862.

Unlike the United States' last appeal, the government's present appeal does not seek reinstatement of Stitt's original death sentence. The United States is not contesting that Stitt is entitled to receive a new penalty-phase hearing. Any challenge by Stitt to his original sentence is therefore moot. *Hyman v. Aiken*, 824 F.2d 1405, 1412 (4th Cir. 1987); *LeCroy v. Sec'y, Fla. Dep't of Corrs.*, 421 F.3d 1237, 1268 (11th Cir. 2005). But the United States is contesting in this appeal the district court's conclusion that the government is now prohibited from seeking a death sentence at a new penalty-phase sentencing. Because the district court has entered a final judgment resentencing the defendant to life plus 780 months, jurisdiction is proper in this Court for the government's appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(b). No certificate of appealability is required for the government's appeal. *See* FED. R. APP. P. 22(b)(3). And regardless of whether this appeal is classified as a civil habeas appeal or a criminal appeal of a sentence, *cf. United States v. Hadden*, 475 F.3d 652, 660-66 (4th Cir. 2007) (discussing when appeal is classified as civil or criminal), the government's notice of appeal is timely and authorized.

Stitt's current appeal challenges the guilt-phase of his trial, but he lacks a certificate of appealability for the issues he raises and is required to obtain one for

3

all of his claims. *Hadden*, 475 F.3d at 664 (challenges to guilt where district court denied relief but conducted a resentencing requires certificate of appealability). As explained more fully below, because Stitt fails to satisfy the standards for receiving a certificate of appealability for his guilt-phase challenges, *see, e.g., Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Rose v. Lee*, 252 F.3d 676, 683-84 (4th Cir. 2001), his appeal must be dismissed.

## ISSUES PRESENTED

1.     The Savings Statute, 1 U.S.C. § 109, provides that the repeal of a statute "shall not have the effect to release or extinguish" any penalty or liability unless Congress includes in the repeal an express grant of amnesty. In 2006, Congress repealed the death-sentencing procedures in 21 U.S.C. § 848 but continued to make offenses listed in § 848(e) death eligible. The repeal of the procedures in § 848 included no express amnesty and simply consolidated all death-sentencing procedures under the Federal Death Penalty Act. Did the district court err in concluding both that the Savings Statute does not save the sentencing procedures in § 848 and that the Federal Death Penalty Act cannot apply, leaving no statutory mechanism to permit a new capital sentencing of defendants like Stitt?

2.    The district court concluded that, even if there were a statutory mechanism to empanel a jury for a capital resentencing of Stitt, the district court had discretion in choosing a remedy under 28 U.S.C. § 2255 to refuse to empanel a new capital sentencing jury. Did the district court err in concluding that § 2255 gives a district court discretion to ignore federal statutes that preclude resentencing by the judge? Did the court also err in granting Stitt relief that placed him in a *better* position than he would have been without his attorney's error at the original sentencing?

3.    This Court previously denied a certificate of appealability for Stitt's claim that one of his lawyers, Norman Malinski, had a conflict of interest because of his statements about his capital experience. Does this Court's denial of a certificate of appealability still apply? If not, does this claim qualify for a certificate of appealability given that Stitt's claim is even weaker now that the government is not seeking to reinstate the original death sentence and simply seeks a new capital sentencing where Stitt will have new counsel?

4.    This Court previously granted a certificate of appealability on whether Malinski had a financial conflict during the guilt phase but then rejected Stitt's claim on the merits in this Court's withdrawn opinion. Does Stitt still have a certificate of appealability for this claim and should this Court entertain the claim when the district court did not clearly err in finding Malinski was paid with

5

a flat fee, when Stitt failed to develop evidence needed to evaluate his claim, and when no prejudice was shown?

## STATEMENT OF THE CASE

The superseding indictment charged Stitt and twelve coconspirators with running an eight-year-long continuing criminal enterprise from late 1990 through April 1998. JA 67-145. During this criminal enterprise, Stitt ordered three murders, and the organization he headed distributed more than 150 kilograms of crack cocaine. *Stitt*, 250 F.3d at 882. Stitt and codefendants Kermit Brown, Robert Mann, and Percell Davis went to trial on September 8, 1998, and the jury returned guilty verdicts against all four defendants. *Stitt*, 250 F.3d at 882.

After a two-month trial, the jury found Stitt guilty of the following offenses:

| | |
|---|---|
| Count 1: | Conspiracy to distribute and possession with intent to distribute cocaine base, 21 U.S.C. § 846. |
| Count 2: | Engaging in a continuing criminal enterprise (CCE), 21 U.S.C. § 848(a) and (c). |
| Counts 3, 5, 7: | Murder during a continuing criminal enterprise, 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. |
| Counts 4, 6, 11, 12: | Using and carrying a firearm during and in relation to a crime of violence and using and carrying a firearm during and in relation to a drug trafficking crime, 18 U.S.C. § 924(c) and 18 U.S.C. § 2. |
| Count 9: | Murder with a firearm during a drug trafficking crime, 18 U.S.C. § 924(j) and 18 U.S.C. § 2. |

| Count 13: | Felon in possession of a firearm, 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 2. |
| Counts 18, 19, 23: | Possession with intent to distribute cocaine base, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. |

*Stitt*, 250 F.3d at 882 n. 3; JA 1855.

Stitt was acquitted on a count of using or carrying a firearm (count 8) and one count of murder in relation to a drug trafficking crime (count 10). JA 1855. Because the conspiracy conviction (count 1) was a lesser-included offense of the CCE, the conspiracy conviction was vacated on the government's motion. *Id.*

At the penalty phase, after hearing testimony for five days and deliberating for three days, the jury unanimously recommended that Stitt be sentenced to death for each of the three convictions for murder during a continuing criminal enterprise. *Stitt*, 250 F.3d at 882. For all three murder convictions, the jury found all of the statutory aggravating factors and 40 of the 46 non-statutory factors that were presented to the jury. *Id.* at 898. The non-statutory aggravating factors found by the jury beyond a reasonable doubt included "assault on a uniformed police officer, threatening to kill several deputy sheriffs and a uniformed police officer, participating in forcible home invasions, participating in a non-charged intentional killing to settle a drug related dispute, and ordering co-defendants to shoot a bouncer at a night club." *Id.*

As this Court observed, "By contrast, the mitigating factors found by the jury (Appendix C) are unremarkable." *Id.* The mitigating factors found by at least one member of the jury included that Stitt was youthful, though not a juvenile, when the murders were committed, that the victims were engaged in criminal conduct at the time of their murders, that Stitt would likely be well-behaved in prison, that Stitt's son would be harmed by the emotional effect of the execution, that Stitt might have been sentenced to life imprisonment, that Stitt had mitigating factors in his background, and that Stitt was under duress at the time of two of the murders. *Id.* The mitigating factors, this Court explained, were considered insufficient by the jury against the "overwhelming force of the aggravating factors which showed the violent and predatory nature of Stitt's character and activities." *Id.* The district court agreed with this conclusion, noting that its own "recollection of the trial" and "review of the record" showed that the "aggravating factors in this case were overwhelming," while the mitigating factors were "unremarkable." *Stitt*, 369 F. Supp.2d at 687. In addition to the death sentences for the three murders, Stitt was also sentenced to a consecutive 780-month sentence for his remaining convictions. *Stitt*, 250 F.3d at 882.

As noted in the jurisdictional statement, the district court granted Stitt habeas relief for a financial conflict that one of his defense lawyers had at the penalty phase, and this Court later dismissed the parties' appeals from that order.

8

*Stitt*, 459 F.3d at 486. The government's current appeal addresses the district court's new ruling following this Court's dismissal of the government's and Stitt's appeal. When the case returned to the district court for a resentencing, the district court *sua sponte* issued an order on November 30, 2006, directing the parties to address the following question:

> Although 21 U.S.C. § 848(i)(1) contemplates the impaneling of a new jury for the purpose of a capital resentencing, can this Court exercise its "broad and flexible § 2255 remedial power," *United States v. Hillary*, 106 F.3d 1170, 1172 (4th Cir. 1997), to "correct the sentence as may appear appropriate," 28 U.S.C. § 2255, and resentence Petitioner without application of the Death Penalty?

JA 1774. In a footnote, the court also noted the repeal of the procedures set forth in 21 U.S.C. § 848.

On February 6, 2007, after briefing from the parties, the district court concluded that neither the Federal Death Penalty Act nor the procedures in 21 U.S.C. § 848 applied. *Stitt*, 475 F. Supp.2d at 574. The court also ruled that even if it had statutory authority to conduct a capital sentencing, the court believed that it had discretion in granting a remedy under § 2255 to refuse to conduct a capital resentencing. *Id.* at 576. The government moved for reconsideration, which the district court denied on April 12, 2007. JA 1833-34.

## STATEMENT OF FACTS

In Stitt's direct appeal, the full transcript spanned 38 volumes, not including the two volumes of pleadings. JA 34. For the present appeal, the government, mindful of this Court's Local Rule 30(b) that the appendix should contain "only those parts of the record vital to the understanding of the basic issues on appeal," did not seek to include the entire trial transcript in the appendix and has relied on the transcripts that defense counsel designated for their appeal. Thus, the government has not sought to provide a comprehensive review of the evidence, beyond the evidence recounted below and the descriptions in this Court's earlier opinions. But the review below of the third murder alone demonstrates the strength of the evidence and the reasons for the death sentence.

*A.    The third charged murder, the death of James Gilliam, Jr.*

On the night that James Gilliam, Jr., who was known as "Slim," was murdered, Stitt and Jason Ortega were in a hallway outside Ortega's apartment in Virginia Beach. JA 344  Stitt was smoking a cigarette, and the two had just finished watching a Mike Tyson fight. *Id.* Using their code language for murders, Stitt said that "tonight would be a good night for Slim to be seen," and Ortega agreed. JA 334-35, 337, 344.

Stitt had previously said that he wanted Gilliam murdered. JA 334. While Stitt, Ortega, and three other coconspirators were in a strip-club parking lot, Stitt

10

discussed who was a "top priority" on the list of people to kill. JA 338. Although

Gilliam was one of Stitt's friends and had become a drug distributor for Stitt, JA

372, Stitt decided that Gilliam had to be killed. Gilliam had "disobeyed an order

and was working with another drug distributor on the side." JA 339.

Stitt was also concerned that Gilliam was becoming a risk to Stitt and his

organization. Gilliam had been dealing drugs with Charlie Boy (whose real name

was Robert Flood), and Charlie Boy was now incarcerated and rumored to be

talking to the police. JA 341. Charlie Boy's incarceration prevented Stitt from

having him killed, JA 339-41, but as Ortega explained, Stitt wanted to limit the

damage from Charlie Boy's cooperation with the police. Charlie Boy's talking

"would bring heat on . . . Slim, and from there it would move up to Mr. Stitt, so

Stitt and I talked about . . . who would need to be seen, and Mr. Stitt said Slim had

to go, and I agreed with him." JA 344. Stitt stayed vigilant about risks like this by

paying people to tell him "anything that had his name or one of the member's

names in it that could possibly harm us." JA 342. Stitt even said that if he were

picked up by police, Ortega and Jason Davis should "make an example by killing

one of the agents or a narcotics officer to show whose town this really was." JA

536. Stitt identified three agents and told Ortega and Davis to take down their

license plates. JA 537. Stitt said that he would use his contacts at the DMV to

find out where the agents lived. JA 537.

11

Because Stitt was Ortega's "boss" and "headed" the drug organization, JA 318-19, Ortega said that he would not have killed Gilliam if Stitt hadn't ordered it. JA 345. Even when Ortega was in prison, Stitt supplied him with drugs to distribute in the prison and had taught him how to cook cocaine into crack. JA 329, 363. Stitt also gave instructions to Ortega to deflect blame away from Stitt. Stitt told Ortega that if he were caught, he should lie about the murder and shift blame to someone other than Stitt. JA 332. Stitt added that if the lie were discovered, Ortega's untruthfulness would discredit him as a witness. JA 332.

After Stitt told Ortega in the hallway to murder Gilliam that night, Stitt finished his cigarette and the two went back into the apartment. JA 345. "We sat a while. He drunk a beer." JA 345. Stitt left after that with his girlfriend and went to their house in Chesapeake. JA 346, 365.

Once Stitt left, Ortega and his wife dropped off one of his wife's friends, Bridget, at her home and returned. JA 349. Another one of Ortega's wife's friends and her son decided to stay and spend the night. JA 366. Once everyone had gone to sleep, Ortega got up and gathered the outfit that he was going to wear when he murdered Gilliam—a pair of black sweat pants, black socks, black tennis shoes, a white T-shirt, a white candle hat, a black long-sleeved T-shirt, and a black ski mask. JA 349. He also grabbed a .38 revolver and nine millimeter, a gun that Stitt had told Ortega to bring. JA 350, 366. Stitt also "preferred that all weapons

12

be clean," meaning that "they were not ever used in a murder. Once the weapon was used in a murder or shooting, we would get rid of them. We would send them to another state, bury them, throw them away, anything." JA 362

Once he left his apartment, Ortega went to a nearby parking lot where he kept a stolen car, or "splat," as he and Stitt called them. JA 367-77. Ortega already had the car for "another job," but "we never got to use it for the other job so I made sure it stayed parked somewhere safe." JA 368. The other job was "the murders of two other people that Mr. Stitt suggested"—Mike Harrington and his girlfriend. JA 368. Ortega did not know Harrington but thought he was a drug dealer from Portsmouth. JA 368. Stitt believed at the time that Harrington was responsible for Charlie Boy's incarceration, but Ortega was unable to carry out the murder because he couldn't find the two. JA 369. Ortega had also considered using the stolen car for another potential murder, a robbery and murder of a person named Blackwell, but Blackwell never showed up at his house. JA 370.

On the night of Gilliam's murder, Ortega put his mask, gloves, and weapons in a grocery bag, put them in the stolen car, and drove to the Brighton section of Portsmouth where Gilliam lived. JA 366, 371. Ortega could not recall the street address, but he had met Gilliam in early 1996, a number of months before Gilliam was murdered on September 8, 1996, and went to his house often. JA 338. "I used to hang with Slim at [his] house. We use to gamble at his house. I brung

13

drugs to Slim before. I brung stolen cars to Slim's yard before. Just about pretty much anything that I was doing, Slim and I would also do." JA 372.

Arriving in the Brighton neighborhood, Ortega "circled the neighborhood about one-and-a-half times to make sure nobody was there, to see if any police was around and to see if Slim was home." JA 373. Finding Gilliam not at home, Ortega parked a block over, got out of the car, and carried the black ski mask with the two guns in it. JA 373. After walking to a tree in a neighboring yard, he put on the black long-sleeved T-shirt over his white shirt, tucked in the black shirt, put on the black ski mask like a hat, and pulled on the gloves. JA 374. With the .38 in his pocket, and the nine millimeter in his hand, he jumped a fence and walked to the back of an abandoned house. *Id.* It was late at night, and he laid down by the side of the house near some bushes. *Id.* Because Gilliam's vehicle was not in the driveway, Ortega knew that he wasn't home. *Id.* After about ten minutes, Ortega crossed the street and hid between some bushes by a tree. JA 375.

About a half hour later, Ortega heard loud music and saw Gilliam drive up to his house. JA 375. As Gilliam backed into his drive, he left the lights on, put the car in park, and got out. JA 376. Two women were with him. Gilliam shut the driver's door. The window was open and he was talking on the phone. *Id.*

14

Ortega emerged from the bushes, pulled down his mask, and walked over to Gilliam. *Id.* As Ortega put a gun to Gilliam's head and cursed, Gilliam apparently recognized him and, using Ortega's name, said, "Jesus, stop playing." *Id.*

Ortega looked at the women in the car and said, "haul ass." *Id.* The woman in the front passenger seat had opened the door and she "went to jump out and fell down. The female in the back pushed the front seat up and jumped over her." *Id.* As the two women ran, Ortega "shot Slim in the head twice, in the temple area, right side." *Id.* Gilliam fell down and Ortega watched the women run and "I stood over him again and I shot him again in the neck." JA 377.

Ortega had been instructed to put some drugs on Gilliam, but he didn't do so. "I couldn't get my hands in my sweat pants pocket with the gloves I had on, so I just walked away from the murder scene back the way I came from the abandoned house over the fence." *Id.* Ortega wrapped the two guns in his ski mask, took off the black shirt, and wrapped the shirt over the ski mask. *Id.* With his gloves still on, he got in the car and drove back to Virginia Beach. *Id.* At his apartment, he burned the clothes that he wore in a barbecue pit and then drove to the ocean where he threw the gun that he had used in the water. JA 378-79.

The next morning Stitt called around nine or ten. "All he said was Slim has been killed. Get ready. We have got to go over to his house. That was it. I hung up the phone, told my wife what happened. She looked surprised. I was like, I am

15

going to go. Tom is going to pick me up." JA 379-80. When Stitt and Ortega

arrived at Gilliam's house, "We pulled into the yard. It was a lot of Slim's family

members in the yard. We got out. We talked to them. We talked to another of

Slim's relatives and we had talked to other relatives." JA 382. "Tom was just

like, if he finds out whoever did it, he's going to put out a hit on him. He's going

to have him taken care of." JA 382.

A funeral was held later, and Stitt paid for it but was not happy about that.

JA 386-87. Both Ortega and Stitt attended the funeral and knew that the FBI and

Portsmouth Police were taking photographs of them. "They were in a white utility

van with a ladder on top of it. Mr. Stitt said, those damn crackers can't leave

people alone in a place. You can't enjoy a funeral." JA 389. Stitt was angry with

Ortega at the time and said that Ortega's name had come up as one of the people

who had killed Gilliam. Stitt "was like, that's not good. You need to clean your

backyard." JA 389-90.

### B.    The home invasions

Stitt chose where his organization would carry out home invasions. JA 414-

15. He didn't want "small money"; he wanted $25,000 or better. JA 415. And in

dividing up money seized, Stitt would keep the majority. JA 440. Testimony at

trial revealed so many home invasions that the district judge remarked, "we had 22

home invasions here I believe come out in direct. I want you to exercise some

16

selectivity, Mr. Groene, whether we are going to go into all these home invasions." JA 433-44.

Ortega recounted one home invasion that Stitt ordered them to carry out against Tishawn, one of Stitt's distributors. JA 421. Stitt, Ortega, Brown, Yadge, Goop, and James Langston went to Tishawn's home because Stitt said Tishawn had ripped off $18,000 of Stitt's money and gone to New York. JA 421-22. The group drove up to the house in two cars and left Brown at the corner to watch for police and provide backup. JA 422. Stitt remained in the car and ordered the others to run inside. "We didn't agree on anything," Ortega explained; Stitt "gave the order." JA 422.

Ortega and the others kicked in the door and ran to a specific room, as they always did. JA 423. But they found no one at home except Tishawn's uncle. *Id.* After tying him to a chair, they search the home for money and drugs. *Id.* They asked the uncle where Tishawn was, and "where Tishawn's baby's mother or girlfriend was," but he provided no information. *Id.* To get answers, they beat his head with pistols, and then ripped an electric cord from a lamp and started strangling him. *Id.* The uncle pleaded that he didn't know anything, but they placed his fingers on a chair and hammered on them with the guns. *Id.* When the uncle said that Tishawn hadn't been there in two days, Ortega and the others did

17

not believe him, and they "beat him until blood came from his nose, his mouth, and we split his head open." JA 423-24.

Ortega, Yadge, and Goop had been doing most of the beating, and Ortega paused and gave his pistol to Alf and said he should continue beating the uncle to see what he could get. JA 424. Ortega meanwhile picked up the electric cord from the lamp and used his teeth to pull the plastic off the wire. *Id.* Ortega told the uncle that he was "going to plug it in and stick the two wires to him." *Id.* The uncle "urinated on himself. He begged for us not to kill him. He told us he didn't know." JA 424.

At that point, the group decided that the uncle did not know anything. Yadge smacked the uncle in the head and went to the kitchen, saying that he was "going to grab himself a snack." JA 424. "So he went in the refrigerator, grabbed something to drink and went in one of the cabinets and I think he grabbed, I don't know if it was cereal or something. We started eating it dry." *Id.*

Goop told the uncle to take off his watch. Although the man was tied up and unable to move, Goop smacked him on the head and said, "Oh, you don't want to take your watch off." *Id.* Ortega and Alf laughed. *Id.*

Violence also often broke out between Stitt's organization and people in other drug rings. Ortega described gun battles between the groups and said that Stitt's group kept "war weapons" or automatic rifles like SKSs, which are smaller

18

versions of an AK-47. JA 350, 411, 413. In another home invasion, when the residents fought back, Ortega described shooting through the ceiling at people upstairs, hoping to hit someone. JA 444. During that gun battle, Ortega was himself shot in the ankle, and when his group collected afterwards at their vehicle, one of them, Bear, said that two others in the group, Alf and Dread, were the ones who had actually wounded Ortega. JA 445. Alf reacted by claiming that Bear shot Ortega and turned his pistol on Bear and Dread, while asking Ortega if he wanted Alf to shoot them. *Id.* Ortega said that he didn't know who did the shooting, and the group ultimately drove off. *Id.*

Stitt's suspicions about members of his organization led to other threats of violence within the group as well. Stitt brought up Sinclair Simon, Jr.'s murder, for example, and said that Jason Davis, who carried out the murder for Stitt, was sloppy, and that Ortega might need to kill him. JA 498.

C.    *Admissions on the strength of the evidence*

In an earlier phase of this case, Stitt's habeas counsel acknowledged that the evidence of his guilt was overwhelming. The evidence was so strong that Stitt argued that his trial counsel was ineffective for not convincing him to plead guilty and accept life imprisonment: "The first day of testimony was devastating. All the defense attorneys recognized that the case was lost for Mr. Stitt—that he certainly could not be acquitted of the major drug charges and all the homicides." JA 1445

19

(Stitt's § 2255 Reply citing Protogyrou dec.¶¶ 6-7; Fredericks dec. ¶¶ 3-5; Swartz dec. ¶¶ 9, 11; McMillian dec. ¶ 4). *See also Stitt*, 369 F. Supp.2d at 690 (accepting this evidence).

Franklin Swartz, one of Stitt's trial lawyers and an attorney with 37 years of experience in criminal law, stated in his affidavit that "I reviewed discovery materials prior to trial and determined that the government's case against Mr. Stitt was overwhelming and that plea negotiations should be initiated." JA 1410. He added that, soon after trial was underway, he explained to Stitt the overwhelming strength of the evidence and recommended that he pursue plea negotiations. JA 1412. The district court noted that Stitt's other defense lawyer, Norman Malinski, also himself "later admitted that the evidence the Government offered was overwhelming, at least on the CCE charges. . . ." *Stitt*, 369 F. Supp.2d at 690. In rejecting one of Stitt's challenges, the district court likewise itself found that the "overwhelming evidence presented during the trial . . . [showed that Stitt] was the leader of the conspiracy in Portsmouth, and that the murders for which [Stitt] was convicted were done at [his] discretion and direction." *Id.* at 698.

At the resentencing in 2007, where the district court imposed life plus 780 months, the court's statements further reflected these conclusions about the weight of the evidence and the gravity of Stitt's crimes:

20

> You were the leader of a conspiracy. You were responsible for the distribution of hundreds of kilograms of crack cocaine being distributed on the streets of the community. You were personally responsible for the deaths and injuries of numerous people during the course of the conspiracy. You have been involved in criminal activity since you were 12 years old. Nothing in your record has ever shown any kind of remorse from you regarding your killings and your criminal activity you were involved in, the damage that you inflicted on people.

JA 1849.

## SUMMARY OF THE ARGUMENT

1. The district court erred in concluding that Congress left no statutory mechanism to enforce Stitt's eligibility for a death sentence under 21 U.S.C. § 848(e). The Savings Statute, 1 U.S.C. § 109, ensures that the repeal of a statute does not "have the effect to release or extinguish any penalty, forfeiture, or liability" under the repealed statute unless Congress expressly provides for an amnesty. In replacing the capital procedures in 21 U.S.C. § 848 with the procedures in the Federal Death Penalty Act, 18 U.S.C. § 3591 *et seq.*, Congress not only did not grant an amnesty but also expressly continued to maintain death eligibility under § 848(e). Thus, Congress manifestly did not intend to eliminate the death sentence for defendants like Stitt whose offenses under § 848 have always remained death eligible. The district court relied on the rule that generally procedures are not saved by the Savings Statute. But as this Court and the Supreme Court have said, a procedural scheme is preserved if it is necessary to

21

enforce a penalty. If the procedures in § 848 are not preserved, then the Federal Death Penalty Act should apply. Statutes must be read together, and repeals by implication are disfavored and must be clear and manifest. Here, if the procedures in § 848 do not apply, then the procedures in the Federal Death Penalty Act can be read to provide a mechanism to enforce the death eligibility in § 848(e) that Congress has continuously maintained.

2.    The district court did not have discretion under 28 U.S.C. § 2255 to refuse to empanel a new capital sentencing jury. Both 21 U.S.C. § 848(i)(1)(C) and 18 U.S.C. § 3593(b)(3) prohibit sentencing by a judge unless *both* the defendant and the government agree. The government did not agree to resentencing by the district court, and nothing in § 2255 gave the district court authority to violate binding federal statutes. The district court also erred by granting Stitt relief that placed him in a better position than he would have been but for his attorney's error at the original sentencing.

3.    This Court previously denied a certificate of appealability for Stitt's claim that one of his lawyers, Norman Malinski, had a conflict of interest because of his statements about his capital experience. This Court should continue to deny a certificate of appealability. Malinski's statements could trigger a financial conflict only if his statements constituted misconduct and could have led to his removal from the case and the loss of his fee. Stitt claims that Malinski lied to

22

qualify as learned counsel under 18 U.S.C. § 3005 and that if he had not lied, he would have been removed from the case. But § 3005 does not apply to defendants who retain their own lawyers, and even if it did, Stitt never made the necessary request for appointment of learned counsel under § 3005. The district court also did not clearly err in finding that Malinski did not lie. Even assuming that Stitt could clear all of those hurdles, he still fails to show prejudice from the conflict. Stitt acknowledges that the evidence of his guilt is overwhelming; he had the assistance of a second lawyer; he fails to identify any defect in Malinski's performance at the guilt phase; and he will receive a new capital sentencing.

4.    This Court previously granted a certificate of appealability on whether Malinski had a financial conflict at the guilt phase, leading him to decide not to hire investigators in North Carolina and Florida. But this Court rejected the claim on the merits in its now-withdrawn opinion. Although the withdrawn opinion is not binding, its reasoning remains persuasive, and a certificate of appealability should not be granted on this issue. The district court did not clearly error in finding that Malinski was paid with a flat fee, and Stitt fails to present evidence showing that the investigators were not hired because of Malinski's financial interest rather than some other reason. Stitt also fails to show any prejudice. All three charged murders occurred in Virginia, as did the firearm and drug counts. Although some overt acts for the conspiracy occurred outside

23

Virginia, the government was not required to prove those overt acts. Stitt's attorneys properly chose to focus on the events in Virginia and the mitigation case, rather than on events in other states.

The government disagrees that the ineffectiveness standard in *Cuyler v. Sullivan*, 446 U.S. 335 (1980) controls, rather than the standard in *Strickland v. Washington*, 466 U.S. 668 (1984). But even under the *Sullivan* standard, Stitt fails to show prejudice. The evidence against Stitt was overwhelming, as he concedes, and he cannot show that there was a plausible, objectively reasonable alternative strategy at the guilt phase that was not pursued because of a financial conflict.

## ARGUMENT

I.    **When Congress replaced the death-penalty procedures in 21 U.S.C § 848 with those in the Federal Death Penalty Act—while expressly retaining death eligibility under § 848(e)—Congress did not eliminate the death sentence for defendants like Stitt who face resentencing for a § 848 offense.**

### A.    Standard of Review

This Court conducts *de novo* review of a district court's interpretation of statutes. *United States v. Nelson*, 484 F.3d 257, 260 (4th Cir. 2007).

### B.    Analysis

A few weeks before this Court issued its now-withdrawn opinion in *United States v. Stitt*, 441 F.3d 297 (4th Cir. 2006), Congress repealed on March 9, 2006

24

the death-penalty procedures found in 21 U.S.C. §§ 848(g)-(r). *See* Pub. L. 109-177, 120 Stat. 231, 232. Although these sentencing procedures were repealed, Congress specifically did not repeal § 848(e), which authorizes the death penalty for certain CCE offenses like Stitt's. Thus, offenses covered in § 848(e) remain death eligible, and for future § 848 capital offenses, the Federal Death Penalty Act (FDPA), 18 U.S.C. § 3591 *et seq.*, now supplies the death-sentencing procedures.

Before the repeal of the procedures in § 848, the FDPA, which was enacted in 1994, did not apply to offenses eligible for death under § 848(e) because 21 U.S.C. § 848(g) specifically required that death sentences for § 848 offenses be imposed only under the § 848 procedures. *See* 21 U.S.C. § 848(g) ("A person shall be subjected to the penalty of death for any offense under this section only if a hearing is held in accordance with this section."). Because Congress expressly repealed § 848(g) when it repealed the § 848 death-sentencing procedures, while leaving in place death eligibility in § 848(e), the statutory obstacle to applying the FDPA for § 848(e) offenses was removed. *See also* 18 U.S.C. § 3591 (authorizing use of FDPA's procedures for federal death-eligible offenses).

As Judge Weinstein has observed, repealing the § 848 death-sentencing procedures and relying instead on the FDPA creates a single, uniform procedure and body of federal law for imposing federal death sentences. "A single trans-substantive procedure applying to all capital cases results in easier amendment,

25

more precise and fuller case law development, and more uniform practice in the complex area of capital prosecutions. It is a simplification easily justified and should be welcomed by the bench and the bar." *United States v. Taveras*, 436 F. Supp.2d 493, 497 (E.D.N.Y. 2006).

After this Court vacated its opinion and remanded for a resentencing, *Stitt*, 459 F.3d at 486, the district court *sua sponte* ordered briefing on the effect of the repeal and concluded that the repeal of the death-sentencing procedures in § 848 eliminated any statutory mechanism for enforcing the death sentence in Stitt's case. *See Stitt*, 475 F. Supp.2d at 576.

The district court's argument relies on two main steps. First, the court held that the FDPA procedures could not be used because the court reasoned that the only provision in the FDPA that authorizes a capital-resentencing hearing requires that the original death sentence be imposed under the FDPA. *See* 18 U.S.C. § 3593(b)(2)(D) (authorizing a capital-sentencing jury if "after initial imposition of a sentence *under this section*, reconsideration of the sentence under this section is necessary") (emphasis added). Second, the court concluded that the repealed death-sentencing procedures in § 848 were not preserved by the Savings Statute, 1 U.S.C. § 109, because the court said that the Savings Statute ordinarily does not save procedures. *Stitt*, 475 F. Supp.2d at 575. The district court also concluded, in a separate argument that the government addresses in Section II below, that the

26

court's equitable powers in devising a remedy in § 2255 authorizes a district court to refuse to grant the government a capital resentencing hearing.

The district court erroneously converted Congress's effort to streamline capital-sentencing law into a windfall that eliminates the death sentence for defendants like Stitt. As explained next, even if Congress had repealed *both* death eligibility and the sentencing procedures, the Savings Statute unquestionably would preserve the death sentence for crimes committed before the repeal, absent an express grant of amnesty by Congress. Thus, where Congress has expressly retained death eligibility in § 848(e) all along, the district court's reasoning that the death sentence has nevertheless been eliminated for Stitt is particularly unsupportable.

Indeed, if the district court's statutory interpretation were well-taken, then the repeal of the death-sentencing procedures in § 848 would leave no mechanism for enforcing the death sentence for any murder covered by § 848(e) that occurred before the enactment of the Federal Death Penalty Act in 1994. Such a situation is not merely hypothetical. Judge Ellis in the Eastern District of Virginia recently confronted the issue in *United States v. Thomas Hager*, no. 1:05CR264, a case where the jury has now returned a death verdict, and ruled that the Savings Statute

27

preserves the § 848 procedures.[1] In contrast, under the view of Judge Jackson, Hager could not receive a death sentence because his violation of 21 U.S.C. § 848 occurred before the 1994 effective date of the Federal Death Penalty Act—a result surely not intended by Congress when it chose to retain offenses listed in § 848(e) as capital offenses.

### 1.    The Savings Statute, 1 U.S.C. § 109, preserves the sentencing procedures in § 848 needed to enforce death eligibility under § 848(e).

By enacting the Savings Statute, Congress rejected the common-law rule and preserved criminal liability—and accompanying punishment schemes—when a now-repealed federal criminal statute applied to the defendant's conduct at the time the defendant acted. The Savings Statute mandates that the "repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide. . . ." As the last quoted clause states, the Savings Statute does have an exception: Congress may expressly grant amnesty in a specific repeal for conduct that occurred before the repeal, but the repeal must "expressly provide" for the

---

[1] After his oral ruling, Judge Ellis said that he will issue a written opinion in *Hager*. The government will promptly notify this Court when that opinion is issued.

28

amnesty; otherwise the Savings Statute's default rule preserves liability.[2] Because

Congress's repeal of the sentencing procedures in § 848 did not include any

express amnesty—indeed Congress expressly retained death eligibility in

§ 848(e)—the exception in the Savings Statute has no application here.

As the Supreme Court has explained, before Congress enacted the Savings

Statute, the existing common-law rule would treat a repeal as eliminating criminal

liability when Congress repealed a statute, creating the risk that Congress, through

inadvertence, might bestow windfalls when it sought to change criminal statutes.

"At common law, the repeal of a criminal statute abated all prosecutions which

had not reached final disposition in the highest court authorized to review them.

Abatement by repeal included a statute's repeal and re-enactment with different

penalties. And the rule applied even when the penalty was reduced." *Bradley v.*

*United States*, 410 U.S. 605, 607-08 (1973) (internal citations omitted). This rule

posed obvious problems for legal reform. "To avoid such abatements—often the

---

[2] The full text of the Savings Statute reads as follows:

The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

1 U.S.C. § 109.

product of legislative inadvertence—Congress enacted 1 U.S.C. § 109, the general savings clause. . . ." *Warden v. Marrero*, 417 U.S. 653, 660 (1974). *See also United States v. Korshin*, 91 F.3d 670, 673 (4th Cir. 1996) (Savings Statute "abolishes the common law rule that repeal or amendment of a statute nullifies the old version of the statute as to pending proceedings.").

As the plain language of the Savings Statute and the cases above make clear, both guilt under the repealed statute and punishment for the violation remain. "[A]ny penalty" or "liability" is preserved. Thus, the Fourth Circuit has long applied the Savings Statute to preserve repealed, more stringent penalty schemes that were in place when a defendant acted. *See, e.g., United States v. Schaefer*, 120 F.3d 505 (4th Cir. 1997) (applying § 109 to law that prohibited a district court from considering post-sentencing conduct as a basis for granting probation); *United States v. Cook*, 890 F.2d 672 (4th Cir. 1989) (applying § 109 to law that prohibited defendant from qualifying for probation); *United States v. Lovely*, 175 F.2d 312, 316-18 (4th Cir. 1949) (applying at resentencing a repealed law that permitted only death or life imprisonment, and refusing to apply new law that allowed imprisonment for less than life). And, of course, the Fourth Circuit applies the Savings Statute to preserve not just the degree of punishment, but also criminal liability in the first instance. *See, e.g., United States v. Smith*, 433 F.2d 341, 342 (4th Cir. 1970) (per curiam) ("Although the Appellant's actions would

30